# EXHIBIT 1 –
# "Deposition of Sgt. Bret Willey"

EXHIBIT 1 –
"Deposition of Sgt. Bret Willey"

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA (RENO)

JENNIFER ANDERSON and FREDERICK WAID, )
as the appointed co-special )
administrators of the estate of ROBERT)
ANDERSON, JR.; JENNIFER ANDERSON; )
JENNIFER ANDERSON, as parent and )
guardian of M.R.A., a minor; )
JENNIFER ANDERSON, as parent and )
guardian of S.G.A., a minor, )
)
Plaintiffs, )
)
vs. ) Case No.
) 3:20-CV-00435-LRH-WGC
LYON COUNTY; TIMOTHY WRIGHT, BRETT )
WILLEY and DOES 3-10, inclusive, )
)
Defendants. )
)

REMOTE VIDEOCONFERENCE DEPOSITION OF

SERGEANT BRETT WILLEY

FRIDAY, MARCH 19, 2021

Reported Stenographically by:

Jinna Grace Kim, CSR No. 14151

Job No.: 334446

Q. Usually, I go about an hour and then take a short break for everybody, but if you feel you need to a break at any time before that, let me know and we'll take a break.
Okay?
A. Okay.
Q. Have you reviewed any documents to help prepare for the deposition?
A. I have.
Q. Can you please tell me what you've reviewed?
A. Just, I guess, it was a transcript of -- it was a transcript of my NDI review and then just legal statutes.
Q. Were you wearing a body cam at the time of the incident?
A. Yes, I was.
Q. And, to your knowledge, was it activated?
A. Yes, sir, it was.
Q. Have you had a chance to look at any of the body cam footage?
A. The only time I reviewed body cam footage was -- I want to say it was one week after -- one week after the incident. It was before the investigative review interview.
Q. And was there another officer present other than you at the time of the shooting?
A. At the time of the shooting, yes, sir.

A. I worked -- well, even at the academy I was already hired by the Lyon County Sheriff's office. So after I graduated from the academy, I continued my employment with them.

Q. What was your initial assignment?

A. When I first got hired my initial assignment was as a jail deputy or the Sheriff's office jail facility deputy. So I was inside working at the jail.

Q. What time frame were you in the jail?

A. From 2006 until I went to the academy the second time around which would have -- I'm not a 100 percent sure. I started at the early 2008, early in that year, 2008.

Q. And then after you were finished with your assignment in the jail, what was your next assignment?

A. I was assigned to the patrol division.

Q. And did that start, you think somewhere in 2008 or so?

A. It started after training period. My initial patrol started in the December of 2008.

Q. And did you have a period of field training?

A. I did.

Q. And how long did that last, approximately?

A. I believe it was 90 shifts, is the way they -- it's three months. So equaling two to three months. I believe it was just shy of 90, 90 shifts.

with a range like you're doing, it's totally fine.
So at some point you were promoted to sergeant?
A. Yes, sir.
Q. Was that in 2016?
A. Yes, sir.
Q. So was it at that time that your assignment changed?
A. Yes, sir.
Q. And so initially you were a sergeant at the jail again?
A. Yes.
Q. And then how long were you at the jail as a sergeant at that time?
A. Maybe a year. I'm not -- it wasn't -- it wasn't that long.
Q. And then were you then assigned to a patrol sergeant?
A. Yes.
Q. And that would be immediately after you left the jail?
A. Yes.
Q. And was that generally your assignment at the time of the shooting incident?
A. Yes, it was.
Q. Other than what you have told me so far, have you

had any other assignments?
A. I had a collateral assignment, our Sheriff's Emergency Response Team which is our -- what you call a SWAT Team, and I began that in April of 2008.
Q. Do you still have that collateral assignment?
A. I do.
Q. Any other assignments that you have had?
A. As far as collateral duties?
Q. Sure.
A. I am currently agency's use-of-force coordinator and I'm a use-of-force instructor. I'm also currently an instructor in OC or the OC chemical. I'm also an instructor in less-lethal chemical munitions mostly used for SWAT Teams, and those are my instructor certificates that I have that are current at this time.
Q. Thank you. The use-of-force coordinator, what is that, essentially?
A. So I basically -- I coordinate the training for the agency, making sure that everyone shows up at training, makes sure everyone meets their POST requirements for their annual training in the grounds or in the area of use-of-force and defensive tactics.
Q. And then as a use-of-force instructor, who do you instruct? Would it be other less-experienced deputies?
A. It would be everyone, any sworn deputy that's

mentioned that you reviewed some written documents that sounded like they related to, you know, deadly force applications or things of that nature.

A. Yes. So it's an agency policy, and then, again, the statutes, the Nevada revised statutes pertaining to use-of-force in the line of duty.

Q. On the day of the incident you were in uniform; correct?

A. Yes, sir.

Q. And you had a firearm, at least one firearm on your person?

A. Yes, sir.

Q. Did you also have a backup weapon or just the firearm?

A. I did not have a backup firearm. I had other tools, but I only had one firearm.

Q. What type of firearm did you have?

A. Glock 17.

Q. What caliber is that?

A. That's a 9 millimeter.

Q. It's semiautomatic?

A. It's semiautomatic, yes, sir.

Q. You essentially have to press the trigger for each shots?

A. Yes.

Q. And how many shots did you fire in the shooting incident that we're here to talk about?
A. To my recollection, it was two.
Q. And then what other tools did you have on your belt?
Did you have OC spray?
A. I did not.
Q. Did you have a Taser?
A. Yes.
Q. And a police baton?
A. I had ASP, yes, sir.
Q. When why is it that you didn't have the OC spray?
Do you normally not carry it, or it just happened that you didn't have it at the time?
A. Several years ago our agency switched to what is an exterior vest carrier, and the holder for my OC did not fit that carrier.
Q. So you were an instructor on OC spray, but at the time of this incident, you did not carry it?
A. Not on my body, no.
Q. Did you have it in the car or somewhere in case you needed it?
A. Yes.
Q. And in terms of you becoming a use-of-force instructor, when did that start, what year?
A. Let me think real quick, rewind the clock here a

A. No.
Q. Do you have an estimate at about what time the shooting incident occurred?
A. Again, without -- just off recollection, I would estimate between 5:00 p.m. and 6:30 p.m. It was earlier in the shift, would be my guess.
Q. What were your shift hours at the time?
A. From 2:00 p.m. to midnight.
Q. And was it light outside, still?
A. Yes.
Q. And were you responding to some type of a call?
A. Yes, sir.
Q. What was the nature of the call you were responding to?
A. It was a domestic battery or domestic violence incident.
Q. Did you have any specific information before getting to the scene? For example, did you have any specific information that anyone was injured?
A. I had information that a child was on the phone; that they were trying to get information out of that child; that the domestic battery or the domestic incident had become a battery because there were allegations of physical injury. They continued to say that the domestic battery was ongoing, meaning, that it was still continuing. It was active

situation at the time of the call; and that someone had possibly been injured.

That's all I that I can remember.

Q. So let me just throw out a few categories and you tell me if you had information on these one way or the other.

Did you have any information that medical was needed? In other words, there was specific injury that you needed to call an ambulance for.

A. I was not aware or told any specific injury before I arrived.

Q. Did you have any specific information that any weapons were involved?

This would be before you got to the scene, and then I'll break it up once you get to the scene.

A. Right. Before the scene I believe the call notes indicated the weapons were unknown.

Q. And the call notes, was that something you could pull up in your patrol vehicles?

A. Yes, it is.

Q. I mean you've probably responded to calls before where they said there were weapons involved?

A. Specifically weapons involved?

Q. Well, like you had information before you got to the scene that there could be a gun or there could be a knife or a pipe or whatever it might have been?

A. Yes.
Q. But at least would you agree there were no specific information in this case that there was, for example, a gun involved?
A. There were no mention of a specific type of weapon, no.
Q. Was there any information that there were weapons at all, generally speaking?
A. The information that was given was specifically stated as unknown weapons.
Q. And what did that mean to you, unknown weapons?
A. That means to me that the dispatcher who is taking that 911 call either was not told specifically that a specific weapon was being used or that the caller who called had not yet given that information.
Q. Based on your experience, if the dispatcher had specific information that there are weapons involved, is that then communicated to the patrol officers for their safety?
A. If they had information on specific weapons, yes.
Q. Before the date of the incident had you ever seen a suspect with a gun their hand before?
A. Yes.
Q. On how many occasions, approximately?
A. Well, to be honest with you, I would have to kind of break the calls down. When you say suspect, you're saying

Q. I'm sorry. I'm back now to the incident of the shooting incident.
I apologize --
A. Yes.
Q. When you responded to the scene was there another officer already there?
A. Yes, sir.
Q. And what officer was that?
A. That was Deputy Timothy Wright.
Q. And were you in essence his patrol sergeant?
A. Yes, I was.
Q. And other than what you've told me so far, did you have any other information about the call before you got there?
A. Other than what I said that I recalled, no.
Q. And then once you got to the scene, did you have a conversation with Deputy Wright about the situation?
A. I recall that I did and I -- I recall that I did.
Q. Do you generally recall what you discussed with him?
A. I recall through the course of my interviews with the investigating detectives that I had said something to him that, basically, of the mention that we needed to get in to get to the wife or the victim.
Q. Anything else you recall about any conversations you had with Deputy Wright after getting to the scene, but before

entering the premises?
A. No.
Q. Did you have any conversation with any family members at the scene before you entered the residence?
A. Yes, sir, I did.
Q. And can you please tell me about that?
A. There was a young female juvenile who was out near the end of the driveway. She had a bandage on her left arm, and she was standing by Deputy Wright's patrol car. I immediately went to her just to make sure she was okay. Then I told her to stay at my patrol car just to kind of stay away from the residence. I then went closer to the door. There was young juvenile male standing at foot of the porch off the stairs. I went to him and told him to go back to my patrol car, and he made the mention to me that -- he was crying, and he made the mention to me that his mom was inside. His dad was hurting her or to the effect that threw her to the ground or something. So I told him to go back to my patrol car.
Q. Any other conversation you recall with either the juvenile male or female?
A. Before the incident, no.
Q. Did you think the juvenile female needed medical attention?
A. I couldn't -- I had to quickly figure out whether that was or not. I did notice she had a bandage. So I

didn't know if that was part of what occurred. I didn't really know. I asked her if she was okay. She said yes.
So I moved on.
Q. Did either the juvenile female or male say that the father had hit them?
A. I don't recall if she said that.
Q. Would your body cam had been on at this point, if you know?
A. Yes, sir, it was.
Q. So whatever the conversation is, probably was caught on the audio portion of the body cam?
A. Yes, sir.
Q. Other than what you've told me so far, any other discussion you had with Deputy Wright before entering?
A. No, sir.
Q. Could you hear anything from the house before you entered?
A. Yes. We could hear some commotion inside the house, muffled voices, but nothing. You know, we could hear people were in the house.
Q. Have you heard the term in your training before "contact and cover officer?"
A. Yes.
Q. What does it mean, essentially?
A. To me when I train, normally that means that the

to the door, and I was the second.
Q. Do you recall one way or the other whether you made any contact with him?
A. I may have brushed -- yeah, I may have brushed as we made entry to make sure I was covering him. So we may have made contact, yes.
Q. Do you ever recall pushing him to the side in any way?
A. No.
Q. Did you say anything after entering the home?
A. I heard Deputy Wright announce "Sheriff Office."
At that time I heard a response coming from the hallway. So I made entry, and I believe the first thing that I said was -- when I saw contact, was "Get on the ground. Get on the ground."
Q. When Deputy Wright said "Sheriff's Department," would you have already just been entering the residence?
A. He announced it just as we were opening the door.
So he opened the door and then announced "Sheriff's Office," and then we heard a response.
Q. What was the response that you heard?
A. "Fuck you, punks."
Q. Based on your training, I'm sure you had people use profanity in your presence before?
A. Yes, sir.

Ms. Anderson.
Q. So just to give me a visual, as you're looking down the hallway, you indicated that Ms. Anderson would have been up against one of the walls of the hallway?
A. Yes. So if you're looking down the hallway, she was on the right side.
Q. And then were you initially when you were looking at Mr. Anderson, were you looking initially at his right side more and then he turned towards you?
A. Yes.
Q. Do you think it was, based on your training, appropriate to shoot him when you first observed him?
A. No.
Q. And why not, based on your training, did you think it was inappropriate to shoot Mr. Anderson when you first saw him in the hallway?
A. When I first observed him in the hallway, I gave him verbal commands to get down. So that incident of me leaning to see him and giving him those verbal commands, I saw the right side of his body. I saw no weapon in his right hand which presented me the small fraction amount of time to give him those verbal commands.
Q. When you gave the commands, I think you mentioned "Get on the ground," or words to that effect?
A. "Get on the ground. Get on the ground."

Q. Two commands, both to get on the ground?
A. Two commands, both the same.
Q. Do you recall if you gave those commands before or after you turned your tac light on?
A. Maybe around the same time. I don't know how quickly I gave.
Q. Do you recall if he was facing in your direction for either of the commands?
A. He started to turn to face me in the middle of the second command.
Q. And at that time did you see any weapon in either one of his hands?
A. Again, I only saw the right hand. I never had good visual of his left hand or the left side of his body.
Q. Was your tac lights still on, to your knowledge?
A. I believe so.
Q. And was it illuminating his -- where on Mr. Anderson, if you know?
A. It was illuminating his upper torso and his face.
Q. Are you trained in a situation like this to look at the hands or pay attention to the suspect's hands?
A. Yes.
Q. And what is the training in that regard?
Why is it important to look at a suspect's hands?
A. Because the hands can carry weapons and the hands

on.
Q. Did you ever give him a verbal warning that you were going to shoot him?
A. No.
Q. How would you describe his gait as he was approaching?
Would you say he was walking, jogging, running, any words you want to use?
A. It was a full sprint.
Q. At the time of your first shot, how close was he to you?
A. Arms' length.
Q. When you say arms' length, you mean approximately three feet or so?
What do you have in mind?
A. Approximately, yeah. Approximately three to four feet.
Q. At the time of your second shot, what would you estimate the distance?
A. Very close. I would say probably half an arms' length or less.
Q. Were you aiming at his chest both for the first and second shot?
A. Yes, sir.
Q. And did he ever make physical contact with you

third shot or not?
A. To my recollection, I remember on-scene, two.
Q. Was there anything -- and I don't want to get into what you learned from your lawyers specifically, but was there anything you learned during the investigation other than from your lawyer that gave you information there may have been a third shot?
A. Yes.
Q. And what did you learn in that regard?
A. I was recalled for a second interview with the Nevada Department of Investigations, and they had advised very similar line of questioning on this to say do you ever recall shooting three. Apparently, they had during the course of their investigation, articulated that a third shot was fired.
Q. Your weapon, to your knowledge, ejects a casing with each shots?
A. Correct.
Q. Do you recall how many rounds that weapon had or you held in the magazine?
A. 17 rounds in the mag'.
Q. Would you generally put 17 in the mag' and one in the chamber for a total of 18?
A. Correct.
Q. Do you know if a round count was done on your weapon

A. No.
Q. Did you specifically ever see him reaching for your gun?
A. Yes, I did.
Q. And did you see that on the video when you watched the body cam, him reaching for your gun?
A. I saw that as it happened on the scene during the incident.
Q. I'm wondering if you could see it when you watched the body cam.
A. Yes. When we were reviewing it, yes.
Q. Okay. We're going to watch it in a little while, and, you know, I might ask you to show me when you see on the body cam him reaching for your gun.
But we'll wait to get there. We might take a break in a few minutes because we've been going awhile.
Is that why you shot him, because he was reaching for your gun?
A. Yes.
Q. Do you have -- if he was not reaching for your gun, based on your training, do you think it would have been appropriate to shoot him?
A. Based on my training, yes. It depends on, again, circumstances, going back to what that deputy saw.
I can't compare this incident to any other.

did you shoot him because he was reaching for your gun, and I thought you said yes.
A. That's correct.
Q. Because that, based on your training, would have been potentially immediate or imminent threat of death or serious bodily injury; correct?
A. Correct.
Q. I mean, you would have, obviously, if he was able to take your gun from you and then potentially use it against you or your partner; correct?
A. Yes.
Q. Okay. So what my hypothetical was, if he had not been reaching for your gun, do you think, based on your training, you would have had that immediate threat of death or serious bodily injury?
A. Not to me unless if he came -- if he wasn't reaching for it?
Q. Yeah.
A. I think the immediacy would still be there only because I still have possession of the gun. In his full sprint he was not -- it was clear to me he wasn't going to stop in the time frame that it took him to get from where he was to me, if I did not fire he was going to run into me and attack me and it would have been a fight over the gun in which I had in my hand where in that case, it would be a high

likelihood of either myself being physically injured or killed with my own gun or my partner being physically injured or killed with my gun.

Q. But you and your partner were close by each other at the time?

A. Correct.

Q. And at any time did Mr. Anderson punch you or attempt to punch you?

A. No.

Q. Did he kick you or attempt to kick you?

A. No.

Q. Did he ever grab you?

A. He did not get to me to grab me, no.

Q. And he never tackled you to the ground; is that fair?

A. Correct.

Q. And which hand are you saying he was reaching for your gun with?

A. The right hand. And then ultimately what I recall seeing on-scene at that incident, I did see eventually both hands coming towards my gun.

Q. So you could see both his right hand and left hand as he was approaching before you fired?

A. At that last second, yes. And then it was -- yes, that last second.

Q. Did you hear any shots being fired before you fired?
A. Not that I recall, no.
Q. Did you hear any shots being fired after you fired?
A. Yes.
Q. And what did you hear in that regard?
A. I would describe it as an unrhythmic round, meaning that there was a round that fired that I knew instantly was not mine.
Q. Do you believe that was from Deputy Wright?
A. Yes.
Q. You didn't think Mr. Anderson fired that round, did you?
A. No.
Q. And let me just ask you a few more questions and then we'll take a break because we started really late and all that stuff.
So did you have training on gun retention?
A. Yes.
Q. And what are some of the methods you were trained to do to keep someone from being able to take your gun?
A. Well -- in the instance where someone is trying to take your gun, one method of training is to pull the trigger to prevent them from taking your gun. Another instance if

A. Initially, no. He was still kind of moving.
So, you know, it seemed to appear that he was still alive at that time, yes.
Q. Did you ever render any medical assistance to him?
A. After I escorted Mrs. Anderson out of the residence, I checked on Deputy Wright as he had an injury as well.
I then ran my patrol car and grabbed our emergency first-aid kit, brought it back inside to begin rendering aid to Mr. Anderson.
Q. What injury, if you know, did Deputy Wright have?
A. He had an injury on the head, or at least he had said that he felt like he got hit on the head. So I looked at him and made sure he was okay, told him to secure and stay where he was just to secure the scene.
Actually, I'll go one further. I actually did a cursory sweep of the residence after removing Mrs. Anderson and then after that residence sweep, I then went back to my vehicle, grabbed my emergency first-aid kit, came back into the house and began rendering first-aid to Mr. Anderson.
Q. Let me just follow up on a little bit of that.
When did you next see Ms. Anderson after the shooting?
A. After the precise moment of the shooting?
Q. Yeah. In other words, you saw her initially and then Mr. Anderson approached as you described. You fired

CERTIFICATE

OF

CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

I, JINNA GRACE KIM, CSR No. 14151, a Certified Stenographic Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath;

That a verbatim record of the proceedings was made by me, using machine shorthand, which was thereafter transcribed under my direction;

Further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have subscribed my name, this date: March 19, 2021.

Jinna Grace Kim, CSR No. 14151

# EXHIBIT 2 –
# "Deposition of Deputy Timothy Wright"

EXHIBIT 2 –
"Deposition of Deputy Timothy Wright"

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA (RENO)

JENNIFER ANDERSON and FREDERICK WAID, as the appointed co-special administrators of the estate of ROBERT ANDERSON, JR.; JENNIFER ANDERSON; JENNIFER ANDERSON, as parent and guardian of M.R.A., a minor; JENNIFER ANDERSON, as parent and guardian of S.G.A., a minor,

Plaintiffs,

vs.

LYON COUNTY; TIMOTHY WRIGHT, BRETT WILLEY and DOES 3-10, inclusive,

Defendants.

Case No. 3:20-CV-00435-LRH-WGC

REMOTE VIDEOCONFERENCE DEPOSITION OF

DEPUTY TIMOTHY WRIGHT

FRIDAY, MARCH 19, 2021

Reported Stenographically by:

Jinna Grace Kim, CSR No. 14151

Job No.: 334446

your recollection about this particular incident?
A. My use-of-force policies, domestic violence policies and NDI report.
Q. Did you give a statement at some point following the incident?
A. I did an interview with NDI.
Q. What does that stand for, if you know?
A. Nevada Department of Investigations, I believe.
Q. Okay. Was that recorded, to your knowledge?
A. Yes.
Q. Did you have an attorney present at the time of the statement?
A. Yes.
Q. And was it taken about a week after the incident?
A. Yes. I believe so.
Q. Did you have a body cam on you at the time that you entered the house?
A. Yes.
Q. And was it activated, to your knowledge?
A. Yes.
Q. And did you have a chance to review your body cam footage before you gave your statement?
A. Yes.
Q. How many times altogether have you seen your body cam footage?

A. No, I did not.
Q. Did you see any weapon on his person?
A. No, I did not.
Q. Did you see any weapons around him on the ground or in the kitchen?
A. I didn't notice anything. It happened so fast.
Q. In between the time you first saw him and the time you fired, did you hear him say anything?
A. Yes. When we made entry to the house we called out "Sheriff's Department," and he said, "Fuck you, punks. Fuck you, punks."
Q. I just want to make sure you understand my question.
I'm talking about the time frame in between when you first saw him and the time you fired. During that couple of seconds, did you hear him say anything?
A. No.
Q. During that time frame did you say anything to him?
A. I did not.
Q. Did you hear any gunshots before you fired?
A. Yes.
Q. How many gunshots did you hear before you fired?
A. Two.
Q. And did you know who was shooting?
A. Yes.

(Video paused.)
BY MR. GALIPO:
Q. Do you want me to play it one more time again?
A. I didn't see anything in his hands.
Q. And that would be both the right hand and the left hand; correct?
A. Correct.
MR. GALIPO: We can take that off.
Thank you, Karen.
BY MR. GALIPO:
Q. How long have you been an law enforcement officer?
A. April first would be 13 years.
Q. What type of work did you do before that?
A. I was a mechanic for 25 years.
Q. And what was your assignment at the time of this incident? Were you assigned to patrol?
A. I was assigned to patrol, and I was an SRO at the time, and the reason I was on duty that day was because school was out, and when school goes out, I fill in slots for patrol.
Q. Did you normally work with the school?
A. Yes.
Q. And you gave me some initials that you know what they are, but is that a School Resource Officer?
A. Correct. I'm sorry. School Resource Officer.

Do you know which kind of Taser you had?
A. I had the X2 that carries two cartridges.
Q. Okay. Thank you.
I might have asked you this, but did you have OC spray?
A. Yes.
Q. And did you have an expandable baton?
A. Yes.
Q. And, obviously, you had body cam; correct?
A. Correct.
Q. And at some point you turned it on related to this incident?
A. Correct.
Q. As part of the information that you had on this incident, was there information you got in the police radio before you got to the scene?
A. I had the domestic violence call that was dispatched to me.
Q. Do you remember as part of the call, it saying negative for weapons?
A. No. I don't recall that.
Q. You were the first officer on-scene?
A. Yes.
Q. And there was some juveniles outside?
A. They were inside. I knocked on the door and they

came outside.
Q. Did either one of them appear injured?
A. No. They were crying.
Q. They seemed upset?
A. Yes.
Q. Were you basically waiting for backup before entering the house?
A. Yes.
Q. And you made a backup request at some point?
A. Yes.
Q. And then your sergeant eventually arrived?
A. Correct.
Q. And did you make any tactical plan with your sergeant before entering the house as to how you were going to handle the situation?
A. No. I just said that -- the daughter said that he's throwing mom around and she needed ambulance, so.
Q. Okay. I'm assuming you've been to domestic disturbance calls or domestic violence calls before?
A. Yes.
Q. Would you agree, based on your training, to use deadly force, there has to be an immediate or imminent threat of death or serious bodily injury?
A. Yes.
Q. You weren't trained that if you go to a domestic

Q. How much time passed from your sergeant getting to the scene and you entering the home?
A. I got to say maybe three to four minutes.
Q. Okay. Did you have time during that time period to talk about a tactical plan?
A. When he arrived on-scene?
Q. Yeah. In between the time he arrived and the time you entered.
A. No. I felt like it was -- we needed to expedite due to the situation.
Q. Did you have any specific information of a specific injury to anyone before you entered the house?
A. It's was just reported to me that the mom needed an ambulance.
Q. Did you request an ambulance before you entered?
A. Yes.
Q. You just didn't know what for?
A. No. I didn't know for what type of injuries.
Q. So before entering you yelled out "Sheriff's" or words to that effect?
A. I believe I yelled out "Sheriff's office."
Q. And you think you did that twice?
A. I believe I did it once.
Q. An is that when you heard an expletive in response?

Q. Do you recall saying in your statement that as Mr. Anderson was coming down the hallway and approaching you, you saw his right hand was clenched?
A. Correct. That's what I saw.
Q. And that it was when you saw his right hand clenched that Sergeant Willey -- is it pronounced Willey?
A. I believe it's Willey.
Q. Willey. Okay. Sorry.
That Sergeant Willey shot twice?
A. I don't know exactly when he shot twice. I don't recall them asking me if his hands positioning of when he shot.
Q. Okay. So I'm just looking at a portion of your statement. And you say his right hand was clenched. It was kind of like that, and then Sergeant Willey shot twice.
Do you recall at some point seeing his right fist clenched?
A. I saw the right hand clenched.
Q. And when you say clenched, you mean like clenched in a fist?
A. Yeah. It wasn't tight. It was just clenched like someone jogging, kind of.
Q. Was that the last position you saw the right hand in before the two shots by Sergeant Willey?
A. I believe so, yes.

Q. Where was your gun at when you heard the two shots from Sergeant Willey?

A. It was pointed towards the subject.

Q. Did you ever say at any time in your statement that you saw Mr. Anderson reaching for your gun?

A. No. I don't believe so.

Q. Did you ever at any time in your statement say that you saw Mr. Anderson reaching for Sergeant Willey's gun?

A. I don't believe I did.

Q. At some point did you trip and fall?

A. Yes, I did.

Q. And what happened? Can you explain that to me, please.

A. Well, after Sergeant Willey fired two shots, the subject was still coming towards us quickly, and I wanted to gain distance, and I fired -- as I turned, I fired my weapon, and I tripped on something on the ground, like my foot just went completely out from underneath me, and I went down and hit an object on my way down. I was trying to gain distance to go around the island that's there in the kitchen, try to -- so we don't have to go hands-on.

Q. Okay. You were trying to avoid going hands-on?

A. I was trying to get distance from him because I was fearful that he was going to get our guns charging at us like that, and after he got shot, he was still charging.

So I wanted to gain distance.
Q. You were afraid that he was going to try to possibly take someone's gun after he was shot?
A. Correct. He kept charging after us, and in my mind, it's like someone that's just been shot twice is still charging, he's got supernatural strength, and I wanted to gain distance.
Q. Okay. How far was he from you at the time of the first shot?
A. I'm going to say -- I'm going to guess four -- four feet.
Q. Is that an estimate?
A. That's an estimate.
Q. And how far was he from you at the time of the second shot?
MS. PARKS: Hang on. Just one second.
And the second shot, you're referring to Sergeant Willey's second shot; correct?
These are just shots that --
MR. GALIPO: Yes, Kathy.
MS. PARKS: Okay. Thank you.
MR. GALIPO: You're welcome.
THE WITNESS: Both shots were fired rapidly, just one immediately after the other. So I can't tell you how far he traveled between the two shots.

Q. Do you recall saying words to that effect?
A. Correct.
Q. Other than seeing the right hand or as the fist was clenched, do you recall seeing anything else about the right hand?
A. No.
Q. How about the left hand?
A. I don't recall seeing the left hand.
Q. Was there anything blocking your view of the left hand, if you know?
A. I believe at that time the left hand was down behind his waist, you know, like if someone ran, you know, if they're running like this.
I don't recall seeing the left hand due to the arm positioning.
Q. Did you ever see him reaching into a pocket?
A. No.
Q. Did you ever see him reaching in his waist band?
A. No.
MR. GALIPO: Let's see if we can show a few of the -- strike that.
BY MR. GALIPO:
Q. Did you hear anybody say "Stop" to him at any time before he was shot?
A. Sergeant Willey told him to get on the ground.

Q. How about "Stop," do you remember if that command was given?
A. I think in the initial report, I think I said "Stop," or I said that I heard "Stop," and then after reviewing the -- his video, then he said, "Get on the ground."
Q. Okay. When you fired your shot did you intentionally fire it as opposed to an accidental discharge?
A. I intentionally fired it.
Q. And you intended to strike Mr. Anderson?
A. Yes.
Q. And this would be after you understood Sergeant Willey to have shot twice?
A. Correct.
Q. When you fired your shot was Mr. Anderson in the hallway or in the kitchen?
A. I believe that would be in the kitchen at that point.
Q. And when Sergeant Willey fired his shots, was Mr. Anderson in the hallway or in the kitchen?
A. I don't know. I don't remember the exact layout, if he was at the entry to the kitchen or in the kitchen because I don't know how far it went into the -- before the hallway started.

CERTIFICATE

OF

CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

I, JINNA GRACE KIM, CSR No. 14151, a Certified Stenographic Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath;

That a verbatim record of the proceedings was made by me, using machine shorthand, which was thereafter transcribed under my direction;

Further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have subscribed my name, this date: March 19, 2021.

Jinna Grace Kim, CSR No. 14151

# EXHIBIT 3 –
# "Relevant parts of Body Cam Video of Deputy Timothy Wright"

EXHIBIT 3 –
"Relevant parts of Body Cam Video of Deputy Timothy Wright"

# To be filed manually

**Jennifer Anderson, et al.**
**vs.**
**Lyon County et al.**
**Case No.: 3:20-cv-00435-LRH-WGC**



**Exhibit 3 - Relevant part of body cam video of Deputy Timothy Wright**

# EXHIBIT 4 –
# "Relevant parts of Body Cam Video of Sgt. Bret Willey"

EXHIBIT 4 –
"Relevant parts of Body Cam Video of Sgt. Bret Willey"

**To be filed manually**



**EXHIBIT 5 –**
**"Declaration of Captain Shawn Clanton in Support of Defendants' Motion for Summary Judgment"**

**EXHIBIT 5 –**
**"Declaration of Captain Shawn Clanton in Support of Defendants' Motion for Summary Judgment"**

Katherine F. Parks, Esq. - State Bar No. 6227
Thorndal Armstrong Delk Balkenbush & Eisinger
6590 S. McCarran Blvd., Suite B
Reno, Nevada 89509
(775) 786-2882
kfp@thorndal.com
Attorneys for Defendants
LYON COUNTY, TIMOTHY WRIGHT,
AND BRET WILLEY

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JENNIFER ANDERSON and FREDRICK WAID, as the appointed co-special administrators of the estate of ROBERT ANDERSON JR.; JENNIFER ANDERSON; JENNIFER ANDERSON, as parent and guardian of M.R.A, a minor; JENNIFER ANDERSON, as parent and guardian of S.G.A., a minor,<br>Plaintiffs,<br><br>vs.<br><br>LYON COUNTY; TIMOTHY WRIGHT; BRETT WILLEY and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO. 3:20-cv-00435-LRH-WGC<br><br>**DECLARATION OF SHAWN CLANTON IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, SHAWN CLANTON, hereby declare:

1. I am over the age of 18 and have personal knowledge of the information contained in this Declaration.

2. I am employed as a Captain with the Lyon County Sheriff's Office and I as so employed on or about September 2, 2019.

3. In my capacity as a Captain with the Lyon County Sheriff's Office, I downloaded video recordings from the body cameras worn by Sergeant Bret Willey and Deputy Timothy Wright of the officer involved shooting incident of September 2, 2019.

4. A true and correct copy of excerpts from the video file of the body camera worn by Deputy Timothy Wright on September 2, 2019, and which depicts the officer involved shooting at issue, has been submitted in manual form on a CD marked as Exhibit 3 to Defendants' Motion for Summary Judgment.

5. A true and correct copy of the excerpts from the video file of the body camera worn by Sergeant Bret Willey on September 2, 2019, and which depicts the officer involved shooting at issue, has been submitted in manual form on a CD marked as Exhibit 4 to Defendants' Motion for Summary Judgment.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct.

EXECUTED this 19TH day of July, 2021.

Capt. Shawn Clanton
SHAWN CLANTON