# Exhibit ''J''

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA (RENO)

JENNIFER ANDERSON and FREDERICK WAID, as the appointed co-special administrators of the estate of ROBERT ANDERSON, JR.; JENNIFER ANDERSON; JENNIFER ANDERSON, as parent and guardian of M.R.A., a minor; JENNIFER ANDERSON, as parent and guardian of S.G.A., a minor,

Plaintiffs,

vs.

LYON COUNTY; TIMOTHY WRIGHT, BRETT WILLEY and DOES 3-10, inclusive,

Defendants.

Case No. 3:20-CV-00435-LRH-WGC

REMOTE VIDEOCONFERENCE DEPOSITION OF

DEPUTY TIMOTHY WRIGHT

FRIDAY, MARCH 19, 2021

Reported Stenographically by:

Jinna Grace Kim, CSR No. 14151

Job No.: 334446

A. My body cam footage?
Q. Yes.
A. Probably three times total.
Q. When was the last time?
A. After my e-mail. They sent me an e-mail. I download it to my e-mail once everything was closed out.
Q. I'm just wondering, you know, the last time you saw it, was it a month ago? A week ago? A year ago?
What would be your estimate?
A. Well, I guess a year. I can't remember. It's been a while.
Q. Your sergeant was there at the time of the shooting?
A. Yes.
Q. And have you ever reviewed his body cam footage?
A. Yes. At the same time. It got sent to me at the same time to my e-mail.
Q. Did you see Mr. Anderson at some point before you fired a shot?
A. Briefly. Yes.
Q. And how much time passed from you first seeing him and to the time you fired?
A. I'm going to say about two seconds.
Q. During that two seconds did you see any weapon in his hands?

A. No, I did not.
Q. Did you see any weapon on his person?
A. No, I did not.
Q. Did you see any weapons around him on the ground or in the kitchen?
A. I didn't notice anything. It happened so fast.
Q. In between the time you first saw him and the time you fired, did you hear him say anything?
A. Yes. When we made entry to the house we called out "Sheriff's Department," and he said, "Fuck you, punks. Fuck you, punks."
Q. I just want to make sure you understand my question.
I'm talking about the time frame in between when you first saw him and the time you fired. During that couple of seconds, did you hear him say anything?
A. No.
Q. During that time frame did you say anything to him?
A. I did not.
Q. Did you hear any gunshots before you fired?
A. Yes.
Q. How many gunshots did you hear before you fired?
A. Two.
Q. And did you know who was shooting?
A. Yes.

(Video paused.)
BY MR. GALIPO:
Q. Do you want me to play it one more time again?
A. I didn't see anything in his hands.
Q. And that would be both the right hand and the left hand; correct?
A. Correct.
MR. GALIPO: We can take that off.
Thank you, Karen.
BY MR. GALIPO:
Q. How long have you been an law enforcement officer?
A. April first would be 13 years.
Q. What type of work did you do before that?
A. I was a mechanic for 25 years.
Q. And what was your assignment at the time of this incident? Were you assigned to patrol?
A. I was assigned to patrol, and I was an SRO at the time, and the reason I was on duty that day was because school was out, and when school goes out, I fill in slots for patrol.
Q. Did you normally work with the school?
A. Yes.
Q. And you gave me some initials that you know what they are, but is that a School Resource Officer?
A. Correct. I'm sorry. School Resource Officer.

you were present for?
A. Yes.
Q. Is this the first time that you fired your weapon in the line of duty?
A. Yes.
Q. Did you have a Taser on you at the time?
A. Yes.
Q. Do you know what the type that was?
A. It was a Glock 9 millimeter.
Q. I think I was asking about a Taser, but you answered another question I wanted to ask.
So your firearm was a Glock 9 millimeter?
A. Yes.
Q. Okay. Maybe you didn't hear me. That's fine.
But I was also asking about whether you had a Taser.
A. I do have a Taser.
Q. What type of Taser was it?
A. I believe it's through Taser company, not a 100 percent sure on that.
Q. Okay. That's okay.
Is it -- Taser International, I think, is the company that makes the Tasers, and they used to have an X26 where you have to change the cartridge, but now I think they came out with an X2 where it has two cartridges in from the beginning.

Do you know which kind of Taser you had?
A. I had the X2 that carries two cartridges.
Q. Okay. Thank you.
I might have asked you this, but did you have OC spray?
A. Yes.
Q. And did you have an expandable baton?
A. Yes.
Q. And, obviously, you had body cam; correct?
A. Correct.
Q. And at some point you turned it on related to this incident?
A. Correct.
Q. As part of the information that you had on this incident, was there information you got in the police radio before you got to the scene?
A. I had the domestic violence call that was dispatched to me.
Q. Do you remember as part of the call, it saying negative for weapons?
A. No. I don't recall that.
Q. You were the first officer on-scene?
A. Yes.
Q. And there was some juveniles outside?
A. They were inside. I knocked on the door and they

Q. Did you ever give him a verbal warning that you were going to shoot?
A. I did not.
Q. Did you ever give him any commands?
A. No.
Q. Do you know if Sergeant Willey had a tac light on his gun?
A. Yes. I believe he did.
Q. Did you have a tac light on yours?
A. I did not.
Q. What type of -- oh, you already told me what type of weapon you had. Sorry.
Do you wear glasses?
A. To read.
Q. Just basically need them to read?
A. Yes.
Q. Did you have glasses on at the time of the incident?
A. No. I don't believe so. I also -- let me interject on that. I also have a pair of glasses that I use for nighttime driving. It's not mandatory that I have them, but I just use it to help me a little bit better at night.
Q. Because you reference some glasses.
Do you know what glasses you had with you at the time?

Q. How about "Stop," do you remember if that command was given?
A. I think in the initial report, I think I said "Stop," or I said that I heard "Stop," and then after reviewing the -- his video, then he said, "Get on the ground."
Q. Okay. When you fired your shot did you intentionally fire it as opposed to an accidental discharge?
A. I intentionally fired it.
Q. And you intended to strike Mr. Anderson?
A. Yes.
Q. And this would be after you understood Sergeant Willey to have shot twice?
A. Correct.
Q. When you fired your shot was Mr. Anderson in the hallway or in the kitchen?
A. I believe that would be in the kitchen at that point.
Q. And when Sergeant Willey fired his shots, was Mr. Anderson in the hallway or in the kitchen?
A. I don't know. I don't remember the exact layout, if he was at the entry to the kitchen or in the kitchen because I don't know how far it went into the -- before the hallway started.

Q. And then it says NEB weapons, but Sergeant Willey thought probably should have been NEG.
A. I don't know about that.
Q. Okay. Let's see if we can play the audio that goes with this and see if that refreshes your recollection as to whether the call initially said negative on weapon.
(Audio playing.)
(Audio paused.)
BY MR. GALIPO:
Q. Did you hear some of that?
A. Yes.
Q. Does that refresh your recollection that the initial call came out as negative on weapons?
A. Yes.
MR. GALIPO: Can we go to Exhibit 2, please.
(Exhibit 2 was marked for identification.)
BY MR. GALIPO:
Q. Okay. Does this look like the hallway?
A. Yes.
Q. I'll represent to you this is a still image from Sergeant Willey's body cam.
But do you see in the background Mr. Anderson?
A. Yes.
Q. And do you see with the light illuminating him, it almost looks like he's wearing a white T-shirt in this image?

A. Well, it looks white to me, yes.
Q. Was that what you were referring to when you said that you saw a white shirt or words to that effect?
A. Yes.
Q. The lights on the -- tac lights on these cameras, they're pretty strong, pretty bright?
A. We don't have lights on our cameras.
Q. I mean lights on the guns. I'm sorry.
A. It all depends on what type of light that you have --
Q. Go ahead. I'm sorry.
A. Some lights create a white light, and some lights create a yellow light.
Q. Okay. This one looks like it creates a white light; right?
A. Correct.
Q. And are those generally pretty bright?
A. Yes.
Q. And have you ever had one shined in your face?
A. Yes.
Q. And is it somewhat blinding?
A. Yes.
Q. Okay.
MR. GALIPO: Let's go to Exhibit 3.
(Exhibit 3 was marked for identification.)

Q. Now, you indicate --
MR. GALIPO: That's fine. We can take that exhibit off, please.
BY MR. GALIPO:
Q. You indicated earlier that you never said in your statement that you observed Mr. Anderson reaching for your gun; is that correct?
A. I believe so. To the best of my recollection, yes.
Q. And the reason you never said that in your statement is because you never observed him do that; isn't that fair?
A. Correct.
Q. And the reason that you did not say in your statement that you saw Mr. Anderson reaching for Sergeant Willey's gun is because you never saw Mr. Anderson doing that; is that also fair?
A. Yes.
Q. What did you do immediately after you fired your shot? I take it you were trying to kind of get yourself together again from falling down?
A. Yes. Once I composed myself I pointed my weapon back at the subject.
Q. Okay. And, obviously, we can see that he was bleeding quite a bit in the kitchen; is that correct?
A. Correct.

BY MR. GALIPO:
Q. At that time did you hear Sergeant Willey telling Mr. Anderson to get on the ground couple times after Mr. Anderson was shot and already on the ground?
A. Yes.
MR. GALIPO: Okay. Thank you.
BY MR. GALIPO:
Q. The BB gun, I think you asked the young male if there were any weapons inside, and he said something to the effect there was a BB gun but he hasn't got that out yet, or words to that effect?
A. Correct.
Q. You didn't see a BB gun at any time before you shot Mr. Anderson, did you?
A. No.
Q. Did the BB gun have any part in your decision to shoot him?
A. No.
Q. Did Mr. Anderson ever run past you at any time?
A. No. Because I turned and fell.
Q. Now, were you trained about tactically retreating in certain circumstances?
A. In certain circumstances, yes.
Q. Were you trying to create distance at this point?
A. Yes.

CERTIFICATE

OF

CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

I, JINNA GRACE KIM, CSR No. 14151, a Certified Stenographic Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath;

That a verbatim record of the proceedings was made by me, using machine shorthand, which was thereafter transcribed under my direction;

Further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have subscribed my name, this date: March 19, 2021.

Jinna Grace Kim, CSR No. 14151