# Exhibit ‘‘K’’

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA (RENO)

JENNIFER ANDERSON and FREDERICK WAID, as the appointed co-special administrators of the estate of ROBERT ANDERSON, JR.; JENNIFER ANDERSON; JENNIFER ANDERSON, as parent and guardian of M.R.A., a minor; JENNIFER ANDERSON, as parent and guardian of S.G.A., a minor,

Plaintiffs,

vs.

LYON COUNTY; TIMOTHY WRIGHT, BRETT WILLEY and DOES 3-10, inclusive,

Defendants.

Case No. 3:20-CV-00435-LRH-WGC

REMOTE VIDEOCONFERENCE DEPOSITION OF

SERGEANT BRETT WILLEY

FRIDAY, MARCH 19, 2021

Reported Stenographically by:

Jinna Grace Kim, CSR No. 14151

Job No.: 334446

the navy?
A. I had various training assignments in the beginning. The first two years were basically filled with training commands and training assignments, and then my final year and a half to two years were --
Q. Did you play any sports in high school?
A. I did.
Q. What sports did you play?
A. High school, just track and football.
Q. What position or positions did you play in football?
A. Running back.
Q. And how about in track, what events did you participate in?
A. Short stop sprints, so just 100, 200 relay.
Q. How tall are you?
A. Trying to see -- I don't know. About 5-8, maybe 5-7, 5-9. I don't know. Off of top of my head, about 5-8, I would guess.
Q. And how much do you currently weigh?
A. Currently I weigh 193 pounds.
Q. And what would you estimate your weight to be at the time of the shooting incident?
A. At that time I was over 200. So I would say between 200 and 205.

Q. And how many shots did you fire in the shooting incident that we're here to talk about?
A. To my recollection, it was two.
Q. And then what other tools did you have on your belt?
Did you have OC spray?
A. I did not.
Q. Did you have a Taser?
A. Yes.
Q. And a police baton?
A. I had ASP, yes, sir.
Q. When why is it that you didn't have the OC spray?
Do you normally not carry it, or it just happened that you didn't have it at the time?
A. Several years ago our agency switched to what is an exterior vest carrier, and the holder for my OC did not fit that carrier.
Q. So you were an instructor on OC spray, but at the time of this incident, you did not carry it?
A. Not on my body, no.
Q. Did you have it in the car or somewhere in case you needed it?
A. Yes.
Q. And in terms of you becoming a use-of-force instructor, when did that start, what year?
A. Let me think real quick, rewind the clock here a

primary officer on-scene or the first person to respond on-scene that would meet with the subject, witness, victim, doesn't really matter who it is. The first person would become the contact, and then the next responding deputy would become a cover officer to help with whatever that needed to be done.

Q. Okay. And are there instances with the contact cover officer configuration that one officer would be designated lethal and one less-lethal?

A. Sometimes, yes.

Q. Did you have any such discussion with Deputy Wright before entering? For example, who would be the contact and would be the cover officer?

A. No.

Q. Any discussion with Deputy Wright about who would be lethal and who would be less-lethal?

A. No.

Q. Was there any discussion you had with Deputy Wright about any tactical plan before entering the residence?

A. Not verbally, no.

Q. Was there a non-verbal communication going on in your mind about a tactical plan?

A. In my mind there was. I worked with Deputy Wright in the past in different tactical trainings and situations, and I knew that he was trained very similar to my training.

Silversprings, Nevada.
Q. And did you have an attorney present for that interview?
A. Yes, I did.
Q. And I think you said that you had a chance to look at your body cam prior to the interview?
A. Yes.
Q. And would it be fair to say that at the time of that interview you were aware that Mr. Anderson had died?
A. Yes.
Q. So other than the "Fuck you, punks," did you hear Mr. Anderson ever say anything else?
A. Just screaming.
Q. Okay. And when he said, "Fuck you, punks," would that be before you actually visually saw him?
A. Yes.
Q. From the time you saw him to the time of the shooting, did he ever say anything?
A. No, sir.
Q. For example, did he verbally threaten to kill you or harm you or anything like that?
A. No, sir.
Q. Where was he when you first saw him, meaning, Mr. Anderson?
A. He was in the hallway of the residence that came off

running, and that was just his right hand.
Q. So you initially saw his right hand when he was turning in a clenched fist?
A. As he was running, yes.
Q. Did his right hand remain in the clenched fist?
A. No, it did not.
Q. Did you ever at any time see any object in his right hand?
A. No.
Q. Did you ever at any time see an object in his left hand?
A. No.
Q. Did you ever at any time see any type of weapon, whether it was a gun or knife or any weapon anywhere on his person?
A. Not on him, no.
Q. What was he wearing, if you recall?
A. No T-shirt, gray shorts, no shoes that I saw --
Q. Did you ever see -- I'm sorry. I thought you were done.
Go ahead.
A. So nothing on his head, no T-shirt, gray shorts, no socks, no shoes.
Q. Thank you. And did you ever see him reaching into the waist band of his shorts?

on.
Q. Did you ever give him a verbal warning that you were going to shoot him?
A. No.
Q. How would you describe his gait as he was approaching?
Would you say he was walking, jogging, running, any words you want to use?
A. It was a full sprint.
Q. At the time of your first shot, how close was he to you?
A. Arms' length.
Q. When you say arms' length, you mean approximately three feet or so?
What do you have in mind?
A. Approximately, yeah. Approximately three to four feet.
Q. At the time of your second shot, what would you estimate the distance?
A. Very close. I would say probably half an arms' length or less.
Q. Were you aiming at his chest both for the first and second shot?
A. Yes, sir.
Q. And did he ever make physical contact with you

A. Yes, sir.
Q. And is that generally like a CAD call type document?
A. One that would be printed out, yeah. It looks a little bit different. This is just like a sequence time order, yes.
Q. Okay. And do you get something similar to this in your patrol unit that shows on the computer that you can access?
A. Yes.
Q. Okay. The first line of it, do you know what those initials essentially stand for?
A. Yes, I do.
Q. Can you please tell us.
A. The MA or the Mary Allen stands for male.
VS, Victor Sam, thats verse or versus. The FE is female. So that would be male versus female. And then physical. And then the next one -- that's supposed to be a "G," but I think it looks like a "B." That would represent negative weapons. Male subject is HBD, which means Has Been Drinking.
Q. Okay. And then we are going to try to play an audio. I'm not going to mark this as an exhibit, but do you recall if when the call came out there was a reference to negative weapons?
A. It was probably said. I don't recall personally.

I know that dispatch does a fairly good job of reading those out.

Q. Let's just see if we can play it and just this position.

(Audio not playing.)

MR. GALIPO: I'm not hearing anything yet. We may be having an issue there.

BY MR. GALIPO:

Q. So while we're trying to play that, do you know where on his body that Mr. Anderson's right hand was when you fired your first shot? In other words, was it waist level, chest level, do you recall?

A. In the stomach chest level, maybe up.

It depends like when I said that's just what I remember is that motion, that forward motion of the arm coming up. I don't recall exactly what the portion of the body it was in reference to.

Q. Okay.

MR. GALIPO: Let's see if we can play this, please.

(Audio playing.)

MR. GALIPO: Okay. We can stop.

(Audio paused.)

BY MR. GALIPO:

Q. So is that part of the reference to the negative weapons we were talking about earlier?

A. Yes.
Q. So it really wasn't unknown weapons.
It was negative weapons; is that fair?
A. That would be fair, yes.
Q. And we'll attach just this portion, I think -- no.
I don't think it's necessary.
MR. GALIPO: Okay. Let's go to Exhibit 2, please.
(Exhibit 2 was marked for identification.)
BY MR. GALIPO:
Q. We took a few still photos from the body cam, and I want to ask you if you recognize some of what is in these photos.
A. That's the hallway.
Q. Okay. And is that --
MS. PARKS: Excuse me, Counsel. Is there some sort of Bates number or some sort of identifier on that photograph?
MR. GALIPO: I don't think so. We made still photos from the body cams.
MS. PARKS: All right.
MR. GALIPO: But there is a time stamp if you want. I'll indicate the time stamp; is that good?
MS. PARKS: That's all right, Counsel. If you're going to provide those to my office after the deposition, that's fine, but can we clarify whose body cam this is from?

CERTIFICATE

OF

CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

I, JINNA GRACE KIM, CSR No. 14151, a Certified Stenographic Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath;

That a verbatim record of the proceedings was made by me, using machine shorthand, which was thereafter transcribed under my direction;

Further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have subscribed my name, this date: March 19, 2021.



Jinna Grace Kim, CSR No. 14151