**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FREDRICK WAID, appointed co-special administrator of the Estate of Robert Anderson Jr.; JENNIFER ANDERSON, as co-special administrator of the Estate of Robert Anderson Jr.; JENNIFER ANDERSON, individually; M. R. A., a minor, through parent and guardian Jennifer Anderson; S. G. A., a minor, through parent and guardian Jennifer Anderson,<br><br>       *Plaintiffs-Appellants*,<br><br>  v.<br><br>COUNTY OF LYON; TIMOTHY WRIGHT; BRETT WILLEY,<br><br>       *Defendants-Appellees*. | No. 22-15382<br><br>D.C. No.<br>3:20-cv-00435-LRH-CSD<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted December 5, 2022
Pasadena, California

Filed November 21, 2023

WAID v. COUNTY OF LYON

Before: Marsha S. Berzon, Ryan D. Nelson, and Bridget S.
Bade, Circuit Judges.

Opinion by Judge R. Nelson;
Partial Concurrence and Partial Dissent by Judge Berzon

## SUMMARY[*]

### Qualified Immunity/Deadly Force

The panel affirmed the district court's summary
judgment granting qualified immunity to two police officers
in an action alleging, in part, that the officers used excessive
deadly force when they shot and killed Robert Anderson
during a response to a 911 call seeking help with a domestic
violence incident.

After officers arrived at Anderson's home, Anderson's
two minor children exited the house and told the officers that
their parents were fighting, that their mother needed an
ambulance, and that there were no weapons in the house
other than a BB gun. When officers entered the house,
Anderson shouted "Fuck you, punks," ignored a command
to get to the ground, and ran down a short hallway towards
the officers, at which point the officers shot him five times.

The panel held that defendants were entitled to qualified
immunity on plaintiffs' Fourth Amendment excessive force
claim because plaintiffs' rights were not clearly

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

established. First, it was not obvious that defendants were constitutionally precluded from firing given that they were responding to an active domestic violence situation, lacked the benefit of having time to fully assess the circumstances, and needed to make split-second decisions as they were being charged.

Second, plaintiffs failed to show controlling authorities (or a consensus of persuasive ones) that would have put every reasonable officer on notice that defendants' conduct violated the Fourth Amendment. Distinguishing this case from other cases, the panel noted that Anderson was in a narrow hall and rapidly approaching the officers, with no barrier between them. He could have accessed the officers' weapons at any time or otherwise harmed them. Further, if the officers took the option to retreat to the house's entryway, they would have left Jennifer Anderson—for whom they had just called an ambulance—alone with her husband or risked injury themselves if Anderson obtained a weapon from somewhere in his home.

The panel held that defendants did not violate plaintiffs' Fourteenth Amendment substantive due process rights because there was no evidence suggesting that the officers acted with a purpose to harm unrelated to the legitimate law-enforcement objective of defending themselves.

Concurring in part and dissenting in part, Judge Berzon would hold that defendants' use of force was unconstitutionally excessive, and they were not entitled to qualified immunity on the Fourth Amendment claim. The officers' repeated, rapid use of deadly force was objectively unreasonable given that Anderson was unarmed, shirtless, empty handed, outnumbered, tactically disadvantaged, not reaching for the officers' guns, and, when the last two shots

were fired, not moving toward the officers. Additionally, *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016), established that an officer may not shoot an unarmed suspect within seconds, multiple times, in rapid succession, and without warning, if the suspect is not reaching for a gun—even when the suspect was recently involved in a domestic violence incident, has not complied with commands, and quickly closes a short distance between the officer and the suspect.

Judge Berzon agreed with the majority that the officers were properly granted qualified immunity on plaintiffs' Fourteenth Amendment claim.

---

## COUNSEL

Dale K. Galipo (argued) and Eric Valenzuela, Law Offices of Dale K. Galipo, Woodland Hills, California; Peter Goldstein, Law Offices of Peter Goldstein, Las Vegas, Nevada; for Plaintiffs-Appellants.

Katherine F. Parks (argued) and Christine R. Hotchkin, Thorndal Armstrong PC, Reno, Nevada, for Defendants-Appellees.

## **OPINION**

R. NELSON, Circuit Judge:

Officers Timothy Wright and Brett Willey responded to a domestic violence call where they shot and killed Robert Anderson. Anderson's estate and family sued Wright, Willey, and the County of Lyon under 42 U.S.C. § 1983 and Nevada law. Defendants moved for summary judgment, and the district court granted qualified immunity to the officers on the § 1983 claims. We affirm.

I

The events leading to Anderson's death began with a 911 call. The caller—who did not request emergency medical care or report any weapons—sought help with a domestic violence incident. Officers Wright and Willey responded, and both wore body cameras that recorded the encounter with Anderson.

Once they arrived at Anderson's home, Wright knocked on the door and announced himself. The Andersons' two minor children, both distressed, exited the house and spoke to Wright in the front yard. They told Wright that their parents were fighting and that their mother needed an ambulance. Wright called for medics. The Andersons' son stated that there were no weapons in the house other than a BB gun.

Wright walked back to the front door, leaving the children behind. Willey joined Wright on the porch in front of the door. Wright recounted what the children had told him and explained that Anderson was "throwing [Jennifer Anderson] around." The officers then entered the home, with Wright entering first and again announcing himself.

Willey, directly behind Wright, drew his weapon and pointed it forward as he entered.

As the officers entered the kitchen, Anderson, out of view, shouted, "Fuck you, punks." Willey, with his gun still drawn, moved past Wright toward a hallway to the left of the kitchen, saw Anderson at the other end of the hallway, and told him to get on the ground. Wright, now behind Willey, also drew and pointed his gun in front of him.

Anderson ignored the commands and ran down the short hallway toward the officers. Willey fired three shots in quick succession at Anderson as Anderson crossed the threshold between the short hallway and the kitchen. Wright fired his weapon twice. Anderson fell to the ground and began to bleed from his chest as Willey continued to shout at him, "Get on the ground!" Willey reported the shots and that the suspect was down. Anderson, who had been shot five times, died from his injuries.

Plaintiffs sued the officers for (1) violating the Fourth Amendment by using excessive force; (2) violating the Fourth Amendment through denying medical care; and (3) violating the Fourteenth Amendment through unwarranted state interference with the familial relationship between Anderson and his wife and children. They also brought three state-law claims against the officers and the County. The district court granted qualified immunity to defendants on all constitutional claims and declined to exercise supplemental jurisdiction over the state-law claims. Plaintiffs appeal only the grant of summary judgment on the Fourth Amendment excessive force claim and the Fourteenth Amendment claim against the officers.

## II

We have jurisdiction under 28 U.S.C. § 1291, and we review the grant of summary judgment de novo. *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021). Summary judgment is appropriate when the movant shows "no genuine dispute as to any material fact" and "entitle[ment] to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In qualified immunity cases, as in other cases, 'we view the facts in the light most favorable to the nonmoving party.'" *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014)).

## III

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It protects government officials "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). We may address either prong first, *see Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009), and "may exercise our discretion to resolve a case only on the second ground when no clearly established law shows that the officers' conduct was unconstitutional," *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021).

A

As to plaintiffs' excessive-force claim, we find the clearly established prong dispositive. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 566 U.S. at 664 (internal quotation marks and alterations omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Supreme Court "do[es] not require a case directly on point"; it requires "existing precedent" to "place[] the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (alteration omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

Cases "cast at a high level of generality" are unlikely to establish rights with the requisite specificity. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam). While a case addressing general principles may clearly establish a right "in an obvious case," *id.*, such obvious cases are "rare," *Wesby*, 583 U.S. at 64. Instead, a clearly established right usually requires "controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 63 (internal quotation marks omitted) (quoting *al-Kidd*, 563 U.S. at 741–42). Plaintiffs must either explain why their case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar situations. *See Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023) (plaintiff bears the burden to show that a right is clearly established).

Plaintiffs argue that granting qualified immunity was improper because genuine disputes of material fact remain, including whether Anderson was reaching for the officers' weapons when he was shot. While we cannot resolve genuine factual disputes at summary judgment, we can nonetheless evaluate an assertion of qualified immunity "by assuming that the version of the material facts asserted by the non-moving party is correct." *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) (citing *Schwenk v. Hartford*, 204 F.3d 1187, 1195 (9th Cir. 2000)).

1

We first conclude that the facts do not show an obvious violation of Anderson's constitutional rights, even when viewed in plaintiffs' favor.

Those few cases in which courts have found obvious constitutional violations are instructive. In one case, Hope, a prison inmate, was chained to a "hitching post" for seven hours as punishment, during which he was forced to be shirtless in the hot sun, given water only "once or twice," and provided no bathroom breaks. *Hope v. Pelzer*, 536 U.S. 730, 734–35 (2002). Although the Supreme Court found that controlling circuit authority clearly established the Eighth Amendment violation, it noted that "[a]rguably, the violation was so obvious that [the Court's] Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution." *Id.* at 741. The Court explained that "[t]he obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment." *Id.* at 745.

We have noted that "this obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context." *Sharp v. County of Orange*, 871 F.3d 901, 912 (9th Cir. 2017). This is so because a categorical statement that conduct obviously violates the Fourth Amendment "is particularly hard to make when officers encounter suspects every day in never-before-seen ways," including "countless confrontations . . . that yield endless permutations of outcomes and responses." *Id.* We thus require Fourth Amendment violations to be "beyond debate" to be considered obvious. *See Hopson*, 71 F.4th at 701 (citation omitted).[1]

For that reason, we have only found obvious violations in exceedingly rare circumstances with extreme facts absent here. For example, we held that the police could not seize the plaintiffs "for over five hours solely because they were witnesses to a crime." *Maxwell v. County of San Diego*, 708 F.3d 1075, 1083 (9th Cir. 2013). While the witnesses were seized, the officers had neither "probable cause to arrest" nor "reasonable suspicion for a temporary *Terry* detention." *Id.* at 1084. Moreover, "[t]he crime was solved," no exigencies justified the detention, and evidence suggested that the officers "did not perceive" a need to secure the crime scene. *Id.* at 1084–85.

We have also held that officers obviously violated the constitutional rights of a sixth-grade student when they

---

[1] Other circuits apply a similarly high standard. *See, e.g.*, *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 337 (5th Cir. 2020) ("The standard for obviousness is sky high[.]"); *Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) ("'obvious clarity' cases" are "rare," a "narrow exception," and "very occasionally encounter[ed]" (internal citations omitted)).

arrested him even though the child was "compliant and calm," committed no known wrongdoing, posed no "threat to himself or others," and "engage[d] in no act of resistance." *C.B. v. City of Sonora*, 769 F.3d 1005, 1027 (9th Cir. 2014). On those facts, we explained that the child's arrest was "an obvious violation of the constitutional principle that the nature of the seizure of a schoolchild must be justified by the circumstances." *Id.*

We recently confirmed that only the rare case will find that conduct obviously violated the Constitution. For example, we concluded that a police officer committed an obvious constitutional violation after he shot and killed a suspect holding a baseball bat because the suspect was not facing the officer, was holding the bat pointed downwards, and was not threatening anyone else when he was shot. *See Est. of Aguirre v. County of Riverside*, 29 F.4th 624, 626–27, 629 (9th Cir. 2022). We noted: "Assuming that [the decedent] posed no immediate threat to [the officer] or others at the time of his death, this 'general constitutional rule' applies 'with obvious clarity' here and renders [the officer's] decision to shoot [the decedent] objectively unreasonable." *Id.* at 629 (quoting *Hope*, 536 U.S. at 741).

Against those cases, the officers here did not obviously violate Anderson's right to be free of excessive force. It was not obvious that the officers' use of force was objectively unreasonable "in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citations omitted). Even assuming that Anderson was unarmed and not reaching for a weapon, there is no dispute that he used aggressive language with the officers, ignored an order from the officers, and rushed towards them in a small and confined space. It is not obvious that the officers were constitutionally precluded from firing in this

situation, where they were responding to an active domestic violence situation, lacked the benefit of having time to fully assess the circumstances, and needed to make split-second decisions as they were being charged.

2

Because this case does not present an obvious constitutional violation, plaintiffs must show controlling authorities (or a consensus of persuasive ones) that would have put every reasonable officer on notice that Wright's and Willey's conduct violated the Fourth Amendment. They have not done so.

In one case, an officer shot an individual nine times, causing him to fall to the ground. *Zion v. County of Orange,* 874 F.3d 1072, 1075 (9th Cir. 2017). The officer then fired nine more rounds into the individual's body from four feet away and stomped on his head three times after seeing that he was still moving on the ground. *Id.* The decedent's mother did not challenge the initial nine shots that brought the decedent to the ground. *Id.* Instead, she argued that the second round and the head-stomping violated the Fourth Amendment. *See id.* We explained that "a reasonable officer would reassess the situation rather than continue shooting" since the suspect may no longer pose a threat after he was shot nine times and fell to the ground. *Id.* at 1076.

Here, Anderson was upright and moving when he was shot. Although he may have started to fall before the officers stopped shooting, the shots were fired sequentially, and Anderson did not fully fall to the ground until after the shooting stopped. At that point, both officers stopped. The shots fired here thus are more like the nine shots that the plaintiff in *Zion* did not challenge.

Plaintiffs' other cases are similarly distinguishable. In *Ting v. United States*, 927 F.2d 1504, 1507–08 (9th Cir. 1991), FBI SWAT agents went to Ronald Ting's home to arrest him. The agents found Ting naked inside his bedroom with a handgun aimed at them. *Id.* at 1508. After Ting complied with an order to drop the gun on the bed, another agent restrained him next to his bed. *Id.* As the agents searched the room, Ting "suddenly pulled his arm free from Agent Burns' grasp, stood up, and lunged toward an unsecured, enclosed dressing area located behind a dividing wall on the other side of the room." *Id.* He was not lunging toward any of the agents in the room or toward the gun on the bed. *See id.* In response, the agent fired one round at Ting's back, aiming to kill. *Id.* We explained that a jury could find Burns' use of deadly force unreasonable because "Ting presents evidence from which a jury could reasonably conclude that he was shot at close range while in a prone position or on his hands and knees." *Id.* at 1510.

Here, by contrast, Anderson was on his feet when he was shot. And, unlike Ting, who did not attempt to retrieve his gun or lunge at the agents searching his room, *id.* at 1508, Anderson was quickly approaching Wright and Willey while ignoring Willey's command to get on the ground. Even if Anderson's hands remained at his side and he never reached for a weapon, Anderson was rapidly advancing on the officers and could access *their* weapons if he was not stopped. *Ting* thus provides no harbor.

Plaintiffs' reliance on *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016), fares no better. There, a woman called 911 to report that her ex-boyfriend, Herrera, took her cell phone after hitting her on the head. *Id.* at 1008. She reported that she was unhurt, her children were fine, paramedics were unnecessary, her boyfriend did not carry

weapons, and he was walking down the road to catch a bus. *Id.* The first officer, who drove a large police SUV, spotted Herrera walking down the road, pulled up behind him, turned on his lights, and commanded him to stop. *Id.* at 1009. Herrera did not comply, opting instead to skip, walk, and run backwards while facing the officer. *Id.* The officer continued to follow him in his SUV. *Id.* A second officer pulled up and tried to cut off Herrera's escape route by driving to Herrera's other side. *Id.* The second officer testified that he did not hear the verbal commands to stop from the first officer. *Id.*

During this time, Herrera had his hand in his sweatshirt pocket. *Id.* The second officer yelled at Herrera to remove his hand from his pocket, and as Herrera took his hand out, the second officer, from his vehicle, shot Herrera twice. *Id.* We held the force was excessive because the domestic violence incident was clearly over. Herrera was not a threat to either his ex-girlfriend or the officers when he was shot, the officers had no reason to believe he was armed, and the second officer unreasonably escalated to deadly force without warning while Herrera was complying. *Id.* at 1011–13.

This case is very different. While Herrera left the scene of the domestic altercation before he encountered the officers, *id.* at 1011, Anderson was in his home and possibly near his wife, whose physical condition was unknown. Unlike in *A.K.H.*, where the decedent's ex-girlfriend told the officers herself that she "was not hurt" and "did not need paramedics," *id.* at 1008, Anderson's children told the officers that their mom needed an ambulance. Further, the officers in *A.K.H.* were in their cars, which provided a physical barrier between themselves and Herrera that would have prevented Herrera from easily accessing their weapons.

*See id.* at 1009.  Here, Anderson was in a narrow hall and rapidly approaching the officers, with no barrier between them.  He could have accessed the officers' weapons at any time or otherwise harmed them.  Further, if the officers took the option to retreat to the house's entryway, as plaintiffs suggest, they would have left Jennifer Anderson—for whom they had just called an ambulance—alone with her husband or risked injury themselves if Anderson obtained a weapon from somewhere in his home.  The facts in *A.K.H.* thus differ materially from the situation Wright and Willey walked into with Anderson.  *A.K.H.* did not clearly establish the law on the facts we face here.

Finally, in *Cruz v. City of Anaheim*, a confidential informant told the police that Cruz was a gang member who sold methamphetamine, carried a gun, had a past felony conviction, and said that "he was not going back to prison." 765 F.3d 1076, 1077–78 (9th Cir. 2014).  Multiple police officers pulled Cruz over for a broken taillight.  *Id.* at 1078. The officers surrounded him, and Cruz tried to escape by backing his SUV into a marked patrol car.  *Id.*  The officers exited their vehicles with their guns lowered and ordered Cruz to get on the ground.  *Id.*  According to the officers, Cruz exited his car, ignored their commands, and reached for the waistband of his pants, prompting all five officers to open fire.  *Id.*  But some facts in the record undermined that account.  A bystander on the other side of Cruz's vehicle witnessed the shooting but was unable to see if Cruz in fact reached toward his waistband because Cruz's car blocked his view.  *Id.*  The officers fired twenty shots in about two to three seconds, killing Cruz.  *See id.*  His body was found "tangled in his seat belt and hanging from it."  *Id.*  The officers did not find a weapon on him but recovered a loaded gun from the passenger seat.  *Id.*

We reversed the grant of summary judgment to the officers because of multiple disputed facts. The case came down to whether a jury would believe the officers given several pieces of evidence that undermined their account. Cruz was unarmed when he died. An officer present had shot a different suspect under the same set of facts. Many officers reported Cruz used his right hand to reach when Cruz was left-handed. And Cruz's body was tangled in the seat belt and had to be cut free, suggesting he could not have exited and turned toward the officers. *Id.* at 1079–80. In explaining these material disputes of fact, we stated,

> [I]f the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door. At that point, the suspect no longer poses an immediate threat to the police or the public, so deadly force is not justified.

*Id.* at 1078–79.

Unlike in *Cruz*, even the facts most favorable to Anderson suggest that he ignored multiple commands and was quickly approaching the officers. And given that the officers were responding to a domestic violence incident and were told that the mother needed an ambulance, this case also differs from other cases involving officer responses to claims of domestic violence on which plaintiffs rely. In those cases, the domestic violence incident was clearly over when force was used. *See George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) ("Carol was unscathed and not in jeopardy when deputies arrived."); *Mattos v. Agarano*, 661

F.3d 433, 449–51 (9th Cir. 2011) (en banc) ("the domestic dispute [was] seemingly over" at the time of the investigation); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) ("Smith was standing on his porch alone and separated from his wife.").

Willey and Wright also had less control of the scene than the officers in *Cruz*. Those police officers surrounded Cruz with their cars, preventing his escape. By contrast, Willey and Wright were both on one side of the hallway, leaving Anderson free to go back toward the rest of the house where his wife presumably was located, possibly trapped or injured. And, in *Cruz*, five officers were present, while Willey and Wright were alone. *See Thompson v. Rahr*, 885 F.3d 582, 590 (9th Cir. 2018) (presence of two deputies rather than six police vehicles was a distinguishing factor for clearly established law analysis). *Cruz*'s facts differ significantly from those here.

Because none of the cases on which plaintiffs rely are sufficiently analogous, we conclude that they cannot put a reasonable officer on notice that the use of deadly force here would be unconstitutional. Thus, the officers are entitled to qualified immunity.

B

The district court also properly concluded that the officers did not violate the Andersons' Fourteenth Amendment substantive due process rights. Under the Fourteenth Amendment, the children of a decedent "generally have the right to assert substantive due process claims." *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018) (citations omitted). Our cases "recognize[] a fundamental liberty interest in the companionship and society of one's child for which the

state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983." *Sinclair v. City of Seattle*, 61 F.4th 674, 678–79 (9th Cir. 2023) (internal quotation marks and alterations omitted). But "[o]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Id.* at 680 (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).

Liability turns on "whether the circumstances are such that 'actual deliberation is practical.'" *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)). "[W]here a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citing *Porter*, 546 F.3d at 1140). By contrast, "[w]here actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Id.* (quoting *Porter*, 546 F.3d at 1137).

The purpose-to-harm standard applies here because Wright and Willey had to make "a snap judgment because of an escalating situation." *Id.* Seconds after entering the home, the officers encountered Anderson approaching quickly toward them. This left little time for actual deliberation. On these facts, the officers' actions do not shock the conscience. No evidence suggests that the officers "acted with a purpose to harm unrelated to the legitimate law-enforcement objective of defending themselves." *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). Thus, Wright and Willey did not violate the Fourteenth Amendment.

IV

Defendants are entitled to qualified immunity on the Fourth Amendment claim because plaintiffs' rights were not clearly established. And the officers did not violate the Fourteenth Amendment.

**AFFIRMED.**

---

BERZON, Circuit Judge, concurring in part and dissenting in part:

Yet again, we have before us a case concerning a confrontation between a civilian and the police resulting in a tragic death. Officers Timothy Wright and Brett Willey, responding to a report of a domestic violence incident, shot and killed Robert Anderson in his home. Anderson's estate and family ("Waid") sued the officers and their employer Lyon County under 42 U.S.C. § 1983 and Nevada law. Reviewing *de novo* the district court's grant of qualified immunity, I would reverse in part and affirm in part. In my view, the officers' use of force was unconstitutionally excessive and the officers are not entitled to qualified immunity on Waid's Fourth Amendment claim. As to those issues, I respectfully dissent. I agree with the majority that the officers were properly granted qualified immunity on Waid's Fourteenth Amendment familial interference claim and so concur in the portion of Part IV of the majority opinion discussing that claim.

## I. Background

On September 2, 2019, an emergency dispatcher radioed local law enforcement about a domestic violence incident in

Silver Springs, Nevada. The dispatch explained that no weapons were involved and that no medics had been requested. The incident reportedly involved a man who had been drinking and a woman, later identified respectively as Robert Anderson and Jennifer Anderson, his wife.

Officers Timothy Wright and Brett Willey ("the officers") responded to the call. At the time of the incident, Wright was 5'10" and weighed approximately 195 pounds. Willey was 5'8" and weighed approximately 205 pounds. Both officers were equipped with a firearm, a taser, and a police baton, and Wright carried pepper spray as well.

Wright was the first to arrive at the home of Jennifer and Robert Anderson. When he got there, Wright knocked on the front door of the home and announced, "Sherriff's Office." The Andersons' two children, M.R.A. and S.G.A., came out. The Andersons' daughter reported to Wright that she thought her mother needed an ambulance. Wright then turned to the Andersons' son and asked if there were any guns in the house. There was only a BB gun, the son stated, and his father had not taken it out.

Willey arrived at the home seconds after Wright's conversation with the children. Wright was standing at the Andersons' front door as Willey approached the porch. Wright told Willey that Jennifer Anderson may need an ambulance and that Anderson was "throwing [Jennifer Anderson] around." Willey asked: "Currently?," and Wright repeated: "Throwing the girl around." The officers' exchange lasted approximately ten seconds.

Wright then again announced, "Sherriff's Office," and pushed the Andersons' front door open. Willey, who was initially behind Wright, drew and pointed his firearm before entering the home; Wright put his hand on his firearm but

left it holstered. Down a hallway that began at the kitchen and went left, Anderson yelled, out of sight of the officers, "Fuck you, punks!" Willey immediately rushed forward past Wright, through the kitchen and toward the hallway, with his gun pointed forward and the attached light on. The lights were on in the kitchen, sunlight was coming through the windows, and the interior of the house was clearly illuminated in the body camera footage. At the corner where the kitchen met the hallway, Willey turned left and saw Anderson, and no one else, in the hallway. Anderson was 5'8" and weighed 185 pounds; he was unarmed and shirtless; both of his hands were visible and open; and there was nothing to be seen in his hands or his waistband.[1] Upon seeing Anderson, Willey shouted to him: "Get down! Get down on the ground right now!"

Anderson started moving quickly down the hallway—characterized as "charging" by the officers—in a straight line; at no point did he change direction or, according to Wright's testimony and a reasonable view of the body camera footage, attempt to reach Willey's gun. As Anderson traveled down the hallway and into the kitchen, Willey,

---

[1] The parties have disputed whether Anderson's hands were visible, whether Anderson's hands were clenched, whether Anderson reached for Willey's gun, and whether Anderson was alone in the hallway. On a motion for summary judgment, all evidence and reasonable inferences are construed in the light most favorable to the non-moving party. *See Lowry v. City of San Diego*, 858 F.3d 1248, 1254 (9th Cir. 2017) (en banc); *Scott v. Harris*, 550 U.S. 372, 380 (2007). Waid's characterization of the facts is largely confirmed by the body camera footage, Wright's testimony, and Waid's expert's declaration, which was based on the body camera footage and relevant documents and reports. So I assume that Anderson's hands were visible, Anderson's hands were not clenched, Anderson did not reach for Willey's gun, and Anderson was alone in the hallway.

without warning and in rapid succession, fired three shots.
Willey fired the first shot from a distance of approximately
three to five feet as Anderson reached the end of the hallway;
he fired the second shot at near point-blank range as
Anderson passed in front of him; and he fired the third shot
at Anderson's back as Anderson fell forward into the
kitchen. Wright fired a single shot at Anderson, after Willey
fired his first two shots and after Anderson had passed
Willey and entered the kitchen.[2]

As the result of the several gunshot wounds, Anderson
lay sprawled on the kitchen floor bleeding profusely, while
Willey repeatedly yelled at him to "get on the ground."
Willey then radioed in the incident and told Jennifer
Anderson, who had emerged from the back of the hallway
after the gunshots were fired, to stay in place. Willey kept
his gun aimed at Anderson, still lying on the kitchen floor
and bleeding, and again instructed him to "stay down."

The special administrators of Anderson's estate, Jennifer
Anderson, and the Andersons' minor children sued Lyon
County, Wright, and Willey, alleging claims under Section
1983 and Nevada law. Under Section 1983, Waid alleged, as
here pertinent, the use of excessive force by the officers in
violation of the Fourth Amendment. The officers moved for
summary judgment on that claim. The district court granted
summary judgment to the officers on Waid's excessive force
claim, holding that Wright and Willey did not commit any

---

[2] Wright testified that he fired his shot after Willey had fired two shots
and when Anderson was in the kitchen. Waid's expert declared that
Wright fired his shot "[a]t the same time" as Willey's second shot. I
adopt Wright's version for present purposes, as it favors Waid. *See
Lowry*, 858 F.3d at 1254.

constitutional violation and were entitled to qualified immunity.

## II. Discussion

We review a district court's grant of qualified immunity on summary judgment *de novo*. *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment . . . in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (alterations and citation omitted). "This principle applies with particular force where the only witness other than the officers was killed during the encounter," as "the witness most likely to contradict [the officers'] story— the person shot dead—is unable to testify." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc) (quoting in part *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

In resolving whether Wright and Willey are entitled to qualified immunity, we ask two questions: first, whether the officers—when the evidence and all reasonable inferences are viewed in the light most favorable to Waid—violated a constitutional right, and second, whether that constitutional right was "clearly established" at the time of the constitutional violation. *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022).

### A. Constitutional Violation

*Graham v. Connor*, 490 U.S. 386 (1989), established the framework for evaluating whether the officers used

excessive or reasonable force against Anderson. Sitting en banc, we explained how to apply *Graham* in such cases:

> We apply *Graham* by first considering the nature and quality of the alleged intrusion; we then consider the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. As we have previously explained, "[t]hese factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*."

*Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)) (citations omitted).

We have considered several factors beyond the enumerated *Graham* factors when evaluating the totality of the circumstances. First, "an officer must give a warning before using deadly force 'whenever practicable.'" *Gonzalez*, 747 F.3d at 794 (quoting *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997)). Second, the availability of "'clear, reasonable and less intrusive alternatives' to the force employed . . . 'militate[s] against finding [the] use of force reasonable.'" *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011) (quoting *Bryan*, 630 F.3d at 831). Third, the length of time before an officer escalates to deadly force can inform our inquiry. *See A.K.H. ex rel. Landeros v.*

*City of Tustin*, 837 F.3d 1005, 1012 (9th Cir. 2016). Fourth, an officer's repeated use of force in a short time span can weigh toward a Fourth Amendment violation. *See Mattos*, 661 F.3d at 445.

Taken together, the foregoing factors in my view demonstrate beyond doubt that Willey and Wright unreasonably used deadly force against Anderson.

### 1. Nature and Quality of the Alleged Intrusion

The officers' intrusion on Anderson's Fourth Amendment interests was "unmatched." *Tennessee v. Garner,* 471 U.S. 1, 9 (1985). "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H.*, 837 F.3d at 1011 (quoting *Garner*, 471 U.S. at 9). Such an "extreme" intrusion, *id.*, "is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others,'" *Gonzalez*, 747 F.3d at 793 (quoting *Scott*, 39 F.3d at 914).

### 2. Governmental Interests at Stake

The severity of Anderson's alleged crime did not justify the officers' use of deadly force. Domestic violence incidents are volatile and dangerous, as "violence may be lurking and explode with little warning" in such situations. *See Mattos*, 661 F.3d at 450 (quoting *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005)). But "domestic disputes do not necessarily justify the use of even intermediate let alone deadly force." *A.K.H.*, 837 F.3d at 1011.

Two factors suggest that the officers' use of deadly force was unwarranted considering the circumstances of Anderson's alleged crime. First, the officers did not shoot Anderson to protect his wife. *See A.K.H.*, 837 F.3d at 1011; *Smith*, 394 F.3d at 702–03. On a reasonable view of the body camera footage, Anderson was alone when Wright and Willey confronted him. At the time of the shooting, Anderson was moving *away* from his wife's presumed location and was not actively engaged in a domestic dispute. So his wife was not "in jeopardy" at the time of the shooting. *A.K.H.*, 837 F.3d at 1011 (quoting *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013)). Consistent with these undisputed facts, the officers do not argue that they used deadly force against Anderson to protect his wife.

Second, Anderson was unarmed throughout the incident, according to the emergency dispatcher, the Andersons' son, and the officers' body camera footage. *See Smith*, 394 F.3d at 702–03; *Peck*, 51 F.4th at 887–88. Although Anderson moved quickly down the hallway upon seeing Willey, "[h]e had no guns or other weapons in his possession and there were none in the house."[3] *Smith*, 394 F.3d at 703. The lack of weapons on Anderson's person throughout the domestic dispute and shooting weighs significantly against the use of deadly force.

Nor did Anderson pose an immediate threat of death or serious physical injury, as required for the use of deadly force under the second and most important *Graham* factor. *See Gonzalez*, 747 F.3d at 793; *Peck*, 51 F.4th at 887. Anderson was unarmed and shirtless. His hands were unclenched and visible. He did not verbally threaten the officers, although he cursed at them, and he did not reach for

---

[3] Except the stored-away BB gun reported by the Andersons' son.

Willey's gun while moving down the hallway, according to Wright's testimony and a reasonable interpretation of the body camera footage. Waid's expert—a police-practices specialist who served as a law-enforcement officer and instructor for 37 years—concluded, after reviewing the officers' body camera videos, depositions of Willey and Wright, and relevant reports and documents, that Anderson "demonstrated no assaultive behavior toward the [officers]" and "made no effort to attack or even make contact with Willey."

As to the officers' vulnerability, the officers outnumbered Anderson and were each larger than him. Each officer was armed with several lethal and nonlethal weapons, including tasers and police batons. The officers were trained in gun-retention techniques and could have holstered their guns and tried physically to subdue Anderson before resorting to deadly force. And as evidenced by the ground covered by Willey when he rushed forward to confront Anderson, the officers had the option to retreat to the entryway of the house. Accordingly, Anderson, an unarmed and outnumbered suspect, did not pose an immediate threat of death or serious bodily injury to the armed and tactically advantaged Wright and Willey, and the officers did not have cause to believe otherwise.

The remaining factor is that Anderson did not get on the ground when ordered to do so and instead moved quickly down the hallway. Contrary to the majority's version of the facts, Anderson was ordered once, not "multiple" times, to get on the ground as he approached the officers. Majority Op. at 16. And the body camera video shows that Anderson was shot *one second* after that command to get down. His failure to comply that fast—if he could even have done so

that quickly—did not justify the use of *deadly* force against him. *See A.K.H.*, 837 F.3d at 1012.

In sum, the enumerated *Graham* factors weigh strongly toward the conclusion that Wright and Willey used excessive force against Anderson.

### 3. Additional Factors

Each of the additional factors that has been used in *Graham* analyses confirms the unreasonableness of Willey and Wright's actions.

First, the officers did not warn Anderson that they would use deadly force. The absence of a warning does not automatically make the use of deadly force unreasonable. *Gonzalez*, 747 F.3d at 797. But an officer's failure to give a warning before using deadly force "whenever practicable," *id.* at 794 (quoting *Harris*, 126 F.3d at 1201), is a factor strongly favoring a finding that excessive force was used. Here, considering that the officers were able to issue the command to get down to Anderson—"Get down! Get down on the ground right now!"—before discharging their firearms, a jury could find that it was practicable for the officers to warn Anderson that they would use deadly force before shooting, e.g., "Get down or we'll shoot."

Second, less intrusive means of force were available. Although "officers need not avail themselves of the least intrusive means of responding to an exigent situation," "police are required to consider what other tactics if any were available, and if there were clear, reasonable and less intrusive alternatives to the force employed, that militates against finding the use of force reasonable." *Glenn*, 673 F.3d at 876 (quoting *Scott*, 39 F.3d at 915, and *Bryan*, 630 F.3d at 831) (internal quotation marks and alterations omitted).

Here, other "clear, reasonable, and less intrusive alternatives" to shooting Anderson were available, given that the domestic abuse was not occurring at the time the officers confronted Anderson and that Anderson was not armed. *See supra*, at 20–21, 26. Rather than use deadly force from the get-go, the officers could have tried using nonlethal force (e.g., their tasers); engaging in tactical retreat; or holstering their weapons and physically subduing Anderson. In his declaration, Waid's expert explained that Willey and Wright could have employed a "contact and cover" arrangement. In such an arrangement, after calling out "contact and cover" at the Andersons' door, Willey would have entered the house first with his taser in hand and Wright would have covered Willey from behind with his firearm, using deadly force only if necessary.**[4]** The officers' failure to use available, reasonable, and less-than-lethal alternatives supports the conclusion that their use of deadly force against Anderson was unreasonable.

Third, the officers immediately—in the one second after Anderson was first commanded to "get down"—escalated to deadly force. Our decision in *A.K.H. ex rel. Landeros v. City of Tustin* concluded that the "less than a minute" gap between the officer's initial contact with the suspect and the officer's firing of his weapon was "perhaps [the] most important" factor in determining that the officer used excessive force against the suspect. 837 F.3d at 1012. Within that short gap, "[l]ess than a second elapsed between [the officer] commanding [the suspect] to take his hand from his pocket and [the officer] shooting him. [The officer] neither warned [the suspect] that he was going to shoot him, nor

---

[4] "Contact and cover" is "a tactic that all police officers receive training on," as Waid's expert explained. Willey received training on that tactic.

waited to see if there was anything in [the suspect]'s hand."
*Id.*

The logic in *A.K.H.* applies with equal force in the
present dispute. Willey drew his firearm before entering the
Andersons' home, commanded Anderson to get on the
ground, and, starting one second after that command, fired
multiple shots at an unarmed Anderson without warning—
with Wright adding his own shot—all within a matter of
seconds. Willey and Wright's immediate escalation to
deadly force against an unarmed suspect supports a
determination that the officers' actions were unreasonable.

Finally, Wright and Willey fired four shots at Anderson
in the span of seconds, at least two of which—Willey's last
shot and Wright's only shot—were fired after Anderson
plainly posed no objective threat whatever to the officers. In
*Mattos v. Agarano*, we held that an "overwhelmingly salient
factor" in deciding that the officer-defendants used
excessive force was that the officers tased the suspect three
times in less than one minute. 661 F.3d at 445. "Three
tasings in such rapid succession," we explained, "provided
no time for [the suspect] to recover from the extreme pain
she experienced, gather herself, and reconsider her refusal to
comply." *Id.* And in *Tabares v. City of Huntington Beach*,
we held that a reasonable jury could find the "number of
shots" fired by an officer to be unreasonable "even had an
initial threat existed," where the suspect had already been
shot multiple times and the officer "did not give [the suspect]
any time to understand or comply with [his] command
before firing the [final] shot." 988 F.3d 1119, 1130 (9th Cir.
2021) (citing *Zion v. County. of Orange*, 874 F.3d 1072,
1076 (9th Cir. 2017)).

A jury could find in this case, as in *Mattos* and *Tabares*, that the number of shots fired by Wright and Willey was excessive and served no reasonable purpose. Willey fired his third shot at Anderson's back after Anderson had already passed Willey and was collapsing into the kitchen. Wright fired his only shot at Anderson after Willey had fired his second shot at Anderson and after Anderson had entered the kitchen and was no longer heading toward the officers. Moreover, Anderson *did* comply with the "get down" order after Willey's second shot, whether willingly or because he was injured and could no longer stand, and yet was shot twice more. The number of shots fired—especially after Anderson could reasonably be understood to pose no danger to either officer—weighs, once again, toward a finding of excessive force.

\* \* \*

A full analysis of the record demonstrates that Willey and Wright used excessive force against Anderson in violation of the Fourth Amendment. Despite Anderson's quick movement toward the kitchen, the officers' repeated, rapid use of deadly force was objectively unreasonable given that Anderson was unarmed, shirtless, empty handed, outnumbered, tactically disadvantaged, not reaching for the officers' guns, and, when the last two shots were fired, not moving toward the officers. The Fourth Amendment does not countenance a predictably deadly seizure in such circumstances.

## B. Clearly Established Law

The next step in the qualified immunity analysis—and the only one undertaken by the majority—is to examine whether the constitutional right violated by Wright and

Willey was clearly established at the time that they shot Anderson. *See* Majority Op. at 8–17.

I first note that, as my colleagues in the majority did not undertake a constitutional merits analysis, their "clearly established law" analysis is conducted in a vacuum. That is, my merits analysis highlights the key aspects of the factual circumstances that in my view give rise to the conclusion that the force used was excessive. One can then look at the law established at the time of the events with a focus on how the case law treated circumstances similar *as to the factors that rendered the force used unreasonable*. Otherwise, the tendency is—as the majority opinion here illustrates—to treat precedent as distinguishable, and therefore as not clearly establishing pertinent law, by focusing on peripheral facts that differ from those in the case before the court but do not illuminate whether the force used in that case was unreasonable.

Further, although, to constitute clearly established law, "[t]he 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted,'" *Peck*, 51 F.4th at 887 (quoting *City of Tahlequah v. Bond*, 585 U.S. 9, 12 (2021) (per curiam), a case "directly on point" is not required, *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Without such a case, "officials may 'still be on notice that their conduct violates established law even in novel factual circumstances,'" particularly in the Fourth Amendment context. *Bonivert v. City of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Only a "high degree of specificity" in prior case law *defining the right* is required. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)) (internal quotation marks omitted). Courts should

generally "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment," *id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)) (ellipses omitted), where the "similar circumstances" are those that in the prior case gave rise to the conclusion that the force used was unreasonable.

Here, there is such a case. This court's decision in *A.K.H. ex rel. Landeros v. City of Tustin* established that an officer may not shoot an unarmed suspect several times—in rapid succession and without warning—when the suspect is not reaching for a gun, even if the suspect is involved in a domestic violence incident, is noncompliant with an order to get down, and is quickly moving toward the officer. *See* 837 F.3d at 1008–09, 1011–13. This ruling offered sufficient notice to Willey and Wright that they used excessive force against Anderson to preclude qualified immunity on Waid's excessive force claim.

In *A.K.H.*, as in the present case, the emergency dispatcher reported a domestic violence incident involving a man and a woman, with no weapons present. *Id.* at 1008. According to the dispatch relayed to officers in *A.K.H.*, the suspect was a known gang member, possibly had a $35,000 traffic warrant out for his arrest, and was on parole for a state drug possession offense. *Id.* at 1008–09. Two officers responded to the 911 call in their vehicles as the suspect was walking down the road from the apartment where he had allegedly assaulted his ex-girlfriend. *Id.* at 1009.

The first officer to encounter the suspect turned on his SUV's red lights, drew his gun, and told the suspect three times to "get down," using his car's loudspeaker. *Id.* The suspect, who had put his right hand in his sweatshirt pocket, did not comply and continued moving away from the

officer's SUV. *Id.* The second officer then drove forward past the first officer's car to box the suspect in, held his gun with the front passenger window open, and shouted at the suspect to "get your hand out of your pocket." *Id.*

While moving quickly toward the second officer's car, the suspect began removing his right hand from his pocket in "an arcing motion over his head." *Id.* Within a second of issuing his command, the second officer fired two shots at the suspect, without warning and in rapid succession. *Id.*; *see also id.* at 1012. The suspect died as a result of his wounds. *Id.* at 1008. The second officer testified that he shot the suspect because he "believe[ed] that he had a weapon and he was going to use that weapon on [him]" as the suspect's right hand had been "concealed" in his pocket with a "heavy" object, and the suspect "charged [him] or shortened the distance or closed the distance at [his] passenger window very quickly." *Id.* at 1009 (alterations in original). Both officers later stated that they never saw anything in the suspect's hands, and the suspect was confirmed after the incident to have been unarmed. *Id.*

We denied qualified immunity to the shooting officer. *Id.* at 1013. Evaluating the *Graham* factors in conjunction with the officer's rapid escalation to deadly force, we concluded that the "the intrusion on [the suspect]'s interests substantially outweighed any interest in using deadly force" and held that the officer violated clearly established Fourth Amendment law when he shot and killed the suspect. *Id.* We noted that the Supreme Court's decision in *Garner* established that a "police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* (quoting *Garner*, 471 U.S. at 11).

*A.K.H.* controls our analysis here. The striking similarities between *A.K.H.* and the current dispute compel the same conclusion regarding the officers' entitlement to qualified immunity. In both cases:

- a dispatcher reported a domestic violence call;
- no weapons were involved in the domestic incident;
- two officers responded to the call;
- the officers did not together establish a tactical approach to handle the situation;
- the second officer rushed forward to confront the suspect with his weapon drawn;
- the suspect did not comply with officer command(s) to "get down";
- the suspect was unarmed;
- the suspect quickly closed the distance between himself and the relevant officers (i.e., Willey and Wright in this case, the second officer in *A.K.H.*)— in the officers' words in both cases, the suspect "charged" at the officers;
- the suspect did not reach for a gun;
- the relevant officers stated that they believed that the suspect was either armed or about to arm himself;
- the officers had the option to retreat or to use less-than-lethal force; and
- instead, the relevant officers shot the suspect several times within seconds of encountering him and without giving any warning.

Under our precedent, no more—and in fact, far less—similarity to the relevant precedent is needed to demonstrate that clearly established law was violated. We have denied qualified immunity to officers solely on the principle that an

officer may not shoot a person who is unarmed and not reaching for a weapon, without requiring other factual parallels to the cases establishing that principle. *See Peck*, 51 F.4th at 887–88. We have determined that a Ninth Circuit case holding that "use of a taser in drive-stun mode on a person who actively resisted arrest, but posed no immediate threat to the safety of the officers or others" was sufficiently specific to establish a constitutional violation for qualified immunity purposes, again without discussing other factual similarities or dissimilarities between the two cases. *See Bonivert*, 883 F.3d at 879–81 (internal quotation marks omitted). With exceedingly similar facts to the present case and a constitutional holding establishing the officer's wrongs, *A.K.H.* easily clears the bar set by our precedent on clearly established law. *A.K.H.* provided pellucid notice to reasonable police officers that shooting and killing Anderson in the circumstances confronting Willey and Wright violated Anderson's Fourth Amendment rights.

Additional precedent underscores this conclusion, confirming elements of the rule determined by *A.K.H.* and highlighting the clearly established nature of the right violated by Wright and Willey.

For instance, our decision in *Cruz v. City of Anaheim*, established that an officer may not shoot a noncompliant suspect several times, in rapid succession and without warning, so long as the suspect was not reaching for a weapon. *See* 765 F.3d 1076, 1077–79 (9th Cir. 2014). Indeed, we have held that "*Cruz* establishe[d] that officers may not fire at a suspect—even an *armed* suspect—absent some reason to believe that the suspect will soon access or use the weapon"; we therefore denied qualified immunity to officer-defendants who shot and killed a suspect when the suspect was not reaching toward a gun when shot. *Peck*, 51

F.4th at 888 (emphasis added). Here, Wright and Willey repeatedly shot Anderson without warning even though Anderson was unarmed and, a jury could conclude, not about to arm himself, considering that: Anderson did not reach for Willey's gun; Anderson gave no indication that he intended to arm himself as he approached and passed Willey; and, even if Anderson had sought to arm himself by reaching for Willey's gun, Wright and Willey had numerous ways to prevent Anderson from doing so, including their gun-retention techniques and the option to retreat. *See supra*, at 20–22, 26–28.

Further, in *Zion v. County of Orange*, we explained that the use of deadly force against a suspect who "no longer posed an immediate threat . . . violated long-settled Fourth Amendment law." 874 F.3d 1072, 1076 (9th Cir. 2017). At an absolute minimum, *Zion*, together with *A.K.H.*, clearly established that Wright and Willey used excessive force against Anderson when they fired shots at him after he was already in the kitchen, was past the officers, and was falling to the ground injured and bleeding.

The majority's reasons for rejecting *A.K.H.* and the other supporting cases as clearly established law are not persuasive.

First, the majority maintains that *A.K.H.* did not put Willey and Wright on notice that their use of force was excessive, and so unconstitutional, because in *A.K.H.* "the domestic violence incident was clearly over." Majority Op. at 14; *see id.* at 16 (distinguishing cases where "the domestic violence incident was clearly over when force was used"). But, on the record viewed in the light most favorable to Waid, the domestic dispute in this case was likewise not ongoing when the officers encountered Anderson. *See supra*,

at 20–21, 26. Anderson was alone in the hallway and moving away from his wife's presumed location when Wright and Willey shot him. *See supra*, at 21–22, 26. In other words, even though the domestic dispute was reportedly ongoing when the officers arrived at the Andersons' home, in both *A.K.H.* and this case, the officers' use of deadly force *at the time they deployed the force* was completely disconnected from the exigencies of the domestic dispute. In both cases, the force was not used to protect the victim of the dispute and so was not justified by the precipitating domestic violence situation.

Second, the majority maintains that *A.K.H.* is distinguishable because the officers in that case were outside and in vehicles. *See* Majority Op. at 14–15. But the "clearly established law" inquiry does not require us to parse differences at this level of detail unless such detail is pertinent to the unreasonable force analysis.

In *Peck*, for example, we denied qualified immunity to the officer-defendants because *Cruz* established that an officer may not use deadly force against a suspect who "was not armed . . . and was not about to become armed." *Peck*, 51 F.4th at 888 (emphasis omitted). There were pronounced factual differences between the two cases: unlike in *Cruz*, the suspect in *Peck* had pointed a gun at someone only moments before the officers arrived on the scene, and unlike in *Peck*, the suspect in *Cruz* was surrounded by police vehicles. But those differences played no role in our qualified immunity analysis in *Peck*. *See Peck*, 51 F.4th at 883; *Cruz*, 765 F.3d at 1078.

The same logic applies here. As in *Peck*, the fact that Anderson was unarmed and, on the record construed most favorably to Waid, not about to arm himself is all that is

needed for "clearly established law" purposes. That, unlike in *A.K.H.*, the incident in this case occurred indoors and did not involve police officers in a car is of no moment to the clearly established law inquiry here, the majority's insistence to the contrary notwithstanding. *See* Majority Op. at 14–15, 17. For one thing, the passenger car window in *A.K.H.*—the one close to the suspect—was open, so the protection a vehicle might otherwise offer was breached. *See A.K.H.*, 837 F.3d at 1009. For another, although they were inside, Willey and Wright could have retreated to the door and removed themselves from contact with Anderson as he moved down the hall into the kitchen. More important, for these details to matter as to the propriety of deadly force, there would have to be a basis for believing Anderson was armed or about to arm himself—and here, again, there was not. Otherwise, the only fear could have been that Anderson would try to hit or butt the officers, which would not justify deadly force in return. So the distinctions relied upon by the majority are beside the point with regard to why the force used against Anderson was unreasonable under clearly established law.

On these facts, then, the officers are not entitled to qualified immunity for their use of excessive force.[5]

---

[5] I note, although the point is not necessary to my "clearly established law" conclusion, that the officer in *A.K.H.* faced a significantly higher probability that the suspect was armed than did the officers in this case. In addition to having an earlier criminal conviction, reportedly having a $35,000 warrant out for his arrest, and being a member of the "Southside Gang," the suspect in *A.K.H.* had one hand concealed in his pocket with a "heavy" object. *See* 837 F.3d at 1008–09. In contrast, Anderson was shirtless and visibly empty-handed; both the dispatcher and the Andersons' son confirmed that Anderson was unarmed in the moments before the officers encountered him; and Anderson had no reported

\*     \*     \*

*A.K.H.* established that an officer may not shoot an unarmed suspect within seconds, multiple times, in rapid succession, and without warning, if the suspect is not reaching for a gun—even when the suspect was recently involved in a domestic violence incident, has not complied with commands, and quickly closes a short distance between the officer and the suspect. Those factors, combined, are more than enough to clearly establish the legal principles governing this case. I would therefore reverse the district court's grant of qualified immunity to Wright and Willey on Waid's Fourth Amendment excessive force claim.

## III. Conclusion

This case involves the use of deadly force against a suspect who was not armed nor thought to be armed when shot. Even though the officers outnumbered the suspect and had nonlethal options, the use of deadly force occurred within seconds of encountering the suspect and continued after he appeared to be complying, voluntarily or otherwise, with the only order he was given—to "get down"—and was already injured. Those who call the police to protect themselves and their families, as the Anderson children did here, have a right to expect that even in tense situations, the actions of the police reflect circumspection about the use of deadly force. That the officers' fears *might* have materialized later if several contingencies occurred—if the suspect had not gotten down as ordered after a reasonable period for

---

criminal record or gang associations. *See supra*, at 19–20, 21 & n.1. In short, if anything, the differences between *A.K.H.* and this case cut in the opposite direction from that posited by the majority here—that is, there was a higher probability in *A.K.H.* than here that the officers were in danger from the suspect.

compliance had elapsed, if lesser force had not worked, if the suspect had grabbed for Willey's gun and managed to obtain it—is not enough to allow killing a suspect when no one, including the domestic abuse victim, was in immediate danger of death or serious bodily injury when the shots were fired. An officer's subjective fear for his safety or the safety of others is not enough to justify the use of force; objective factors must justify the officer's fear. *See Mattos*, 661 F.3d at 441–42. And peripheral factual differences with otherwise controlling precedents cannot be allowed to provide immunity to police officers for shooting and killing an unarmed suspect who was making no attempt to arm himself or otherwise threatening anyone with death or serious injury.

For the foregoing reasons, I respectfully but emphatically dissent from the majority decision to uphold the district court's grant of summary judgment to the officers on Waid's Fourth Amendment excessive force claim.